BOYD *v.* BOYD.

Opinion delivered March 27, 1916.

1. MENTAL CAPACITY—TRANSFER OF PROPERTY.—The finding of the chancellor that deceased, who was suffering from cancer, had mental capacity, a short time before his death, to transfer all his property to defendants, upheld.

2. EVIDENCE—CONFLICTING STATEMENTS—WEIGHT.—Where a witness, in answer to interrogations, made conflicting answers, the statements made without the prompting of a leading question, and without suggestion, should have the greater weight.

3. EVIDENCE—STATEMENTS OF DECEASED—DISPOSITION OF PROPERTY.—Deceased, upon his death bed, deeded all his property to his son, who in turn deeded the same to the widow; in an action by a grandson, to set aside the conveyances, *held,* testimony in regard to the previous declarations of the deceased as to the manner in which he expected to dispose of his property at his death, and of his intention that his wife should have a life estate therein, and that after her death it should be divided equally between his grandson and his son, was competent.

4. DEEDS—VALIDITY—INTENTION OF GRANTOR.—Certain deeds, executed by deceased upon his death bed, *held,* under the evidence not to be deeds drawn in the form which deceased wished to execute.

5. DEEDS—INTENTION OF GRANTOR—SUBSEQUENT ACTS OF GRANTEE.—Where a deed, executed upon his death bed by deceased was not drawn according to deceased's intention, and named his son as grantee, when deceased wished his wife as grantee, subject to certain restrictions, nothing that the son could do after the death of his father, would validate the transfer, and make it the act and deed of the deceased.

6. DEEDS—MENTAL CAPACITY—PHYSICAL AND MENTAL WEAKNESS OF GRANTOR.—Where a grantor, so weakened by disease, that he was unable to lift his hand, executed a deed, the same, when challenged after his death, which occurred immediately, will be carefully scrutinized, and the burden of proving its validity is upon the party claiming a benefit thereunder.

7. DEEDS—PHYSICAL AND MENTAL WEAKNESS OF THE GRANTOR—VALIDITY.—If a person, although not positively *non compos* or insane, is yet of such great weakness of mind as to be unable to guard himself against imposition or to resist importunity or undue influence, a contract made by him under such circumstances will be set aside.

8. DEEDS—MENTAL INCAPACITY—RELIEF.—Where deceased, due to mental incapacity, executed a deed which was not in conformity to his intention, the same is void, and the chancellor should declare it so, and should not attempt, under a prayer for general relief, to reform the same.

Appeal from Searcy Chancery Court; *T. H. Humphreys,* Chancellor; reversed.

### STATEMENT BY THE COURT.

W. F. Boyd died on the 2d day of April, 1912, leaving surviving him his widow, S. J. Boyd, and his son, C. A. Boyd, and his grandson, Haco Boyd a youth about ten years of age.

This suit was instituted by S. G. Daniel, as administrator of the estate of W. F. Boyd, and by Haco Boyd, through his mother as next friend. The complaint alleged that W. F. Boyd died siezed of certain lots and parcels of land in Searcy County, which are described, and also that he owned certain personal property consisting of stock in the First National Bank of Leslie, worth $2,500, and money on deposit in that bank in the sum of $800; that John Norman was indebted to him in the sum of $2,000; P. P. Boyd in the sum of $1,500, and Marion Dickens in the sum of $1,600, and various other parties in varying amounts, which were assets of the estate and should be turned over to the administrator thereof. They alleged that "on the night before the death of W. F. Boyd, and when he was greatly weakened from fever and the ravages of his disease, and while he was unconscious and in the very shadow of death, the defendants, C. A. Boyd and S. J. Boyd, by fraud, misrepresentations, concealment, overreaching and undue influence, procured the signature, by mark, of the said W. F. Boyd to an instrument of writing which purports to be a warranty deed conveying from W. F. Boyd and S. J. Boyd to C. A. Boyd all the above described property; that W. F. Boyd at the time did not have the mental capacity to execute a deed or to transact any business of any kind whatever or to understand the effect of the transaction."

The plaintiff, Haco Boyd, alleged that the pretended deed was an attempt to defeat him of his right to said property as heir, and was a cloud upon his title; that he was the owner of an undivided one-half of all the lands left by his grandfather, subject to the rights of the widow under the law, in said property.

And they further alleged that C. A. Boyd and S. J. Boyd wrongfully and fraudulently took possession of the money and bank stock and appropriated the same to' their own use. Plaintiff, Haco Boyd, prayed that the deed be cancelled, and plaintiffs both prayed that the shares of stock, the money and all other personal assets in the hands of the defendants be surrendered and turned over to the administrator for proper distribution.

Appellants, C. A. Boyd and S. J. Boyd, denied the allegations of the complaint, and set up that W. F. Boyd "at the last practical time prior to his death sold and delivered to S. J. Boyd all his personal property, including moneys, bank deposits, bonds and notes," and that when he executed the deed described in the complaint he acted upon his own free will and accord, and that he had full mental capacity to execute the same, having "full understanding of the effect of said deed; that at the time of the execution of said deed and the assignment of his personal property it was agreed and understood by and between the said W. F. Boyd, deceased, C. A. Boyd and S. J. Boyd; that the deed above referred to was to be executed to said C. A. Boyd to hold the same in trust for the said S. J. Boyd, and that the said C. A. Boyd was to execute a deed to all the property conveyed to him by the said W. F. Boyd to the said S. J. Boyd, which deed had been duly executed in accordance with said agreement, thereby investing the said S. J. Boyd with all the real and personal property which said W. F. Boyd possessed in his lifetime, and that W. F. Boyd died intestate and without any estate whatever."

The court below found that "at the time the transfer of all of said property by the deceased it was done at impending death, and that he was so weak mentally and physically that the court has grave doubts of his mental capacity to make said transfer, but finds that there is not sufficient evidence to warrant the cancellation thereof; but the evidence warrants a finding that the deed and transfer should be reformed so as to pass a life estate only to S. J. Boyd;" and further found that the personal

property amounted in value to $6,427.68; that S. J. Boyd had turned all of said personal property over to C. A. Boyd, who had taken the same out of the jurisdiction of the court and had invested it in the State of Utah recklessly and in speculative securities which was more likely to result in waste. Upon this finding the court rendered a decree as follows: "That all conveyances and transfers be and are reformed so as to convey to S. J. Boyd a life estate only in said real estate and personal property; and that said defendants, C. A. Boyd and S. J. Boyd, are ordered to return one-half of all of said personal property either in kind or in money to this jurisdiction and invest same in safe and sound securities for the benefit of S. J. Boyd during her natural life, and after her death to Haco Boyd, her grandson." And dismissed the cause as to all other defendants. Both parties have appealed.

*A. Y. Barr,* for appellants.

1. The evidence is overwhelming and conclusive that William Boyd was sane—knew what he was doing—and that no fraud was practiced on him. He was weak physically, but his mind was not impaired. Sanity and business capacity are presumed until the contrary are shown by evidence clear, satisfactory and convincing. This is elementary law.

2. No reformation of the deed should have been allowed. It was good or void. The law is well settled. 15 Ark. 555; 141 S. W. 1168; 101 Ark. 611.

3. Boyd did what he intended to do; left his property to his widow with the boys to receive whatever she left to them. The case has been fully made out and the case should be remanded with directions to dismiss the bill.

*Bratton & Bratton, David Cotton* and *Garner Frazer,* for appellees.

1. The pleadings warranted a cancellation or reformation. 96 Ark. 163; 91 *Id.* 400. The prayer was for general relief. 31 Cyc. 111. The court did not exceed its authority.

2. A life estate was intended without limitation. The finding is not clearly against the evidence. 101 Ark. 529; 85 *Id*. 105.

3. On the cross-appeal, the entire transaction should be cancelled. 14 Mich. 541; 133 Iowa 681; 100 Wis. 24; 63 Neb. 349; 2 Pom. Eq. Jur. (3 ed.) 951; Thornton on Gifts, 447 § 450; 33 Md. 188; 63 Tenn. 947. C. A. Boyd received the benefit of this death-bed conveyance; the burden is on him to show its fairness and the capacity of the grantor. He has failed. 15 Ark. 603; 26 *Id*. 110.

4. The whole business smacks of fraud and smells of suspicion; the deed and assignments should be cancelled. 15 Ark. 603; 26 *Id*. 110; 99 Mass. 88. The decree should be reversed with directions to cancel the entire transaction.

Wood, J. (after stating the facts). (1) The first question is whether or not William Boyd, at the time of the execution of the deed, and of the alleged transfer of personal property, had sufficient mental capacity to understand the nature and effect of these transactions. This is purely an issue of fact which must be determined by the preponderance of the evidence.

William Boyd, for over a year before his death, had been afflicted with cancer. This disease gradually preyed upon his vitals until he finally died from exhaustion. The testimony is conflicting, but the finding of the chancellor that Wm. Boyd had sufficient mental capacity to execute the instrument is not clearly against the preponderance of the evidence.

The next question is whether or not Boyd executed the deed conveying the land and transferring the personal property in controversy with the intention of vesting absolute title therein to S. J. Boyd, his wife. This is also peculiarly a question of fact, depending upon a preponderance of the evidence.

C. A. Boyd was the only son and the only living child of William Boyd. He had been living away from his father some fifteen years, in Idaho and Utah. He stated that during these years he had seen his father

only for brief periods some five or six times; that his personal association with his father had not been close for some fifteen years. Appellee Haco Boyd, whose father was dead, was the grandson of William Boyd. C. A. Boyd was a lawyer, and testified that he had prepared the papers to carry out his father's wishes; that his father signed all instruments by mark because of his weak physical condition, and requested two or three of those present to sign as witnesses; that his mind was good and he appeared to understand his business and his own condition and the condition in which his mother would be left at his death as well as at any time in former and healthier years. He stated that he never suggested to his father at any time what to do or urged him to make the disposition of the property that he did make; that his father asked him to arrange his property so that if he should die that his mother would have it all. He then suggested a will, but his father stated that he would rather turn it right over to her and that he would know that it was done. Witness then prepared all the papers and made the transfers that were made. He suggested to his father that the better way to convey the real estate would be for him and his mother to join in a deed to some third person, with the understanding that such person then make a deed direct to his mother, and that accordingly the instrument was prepared and executed.

Mrs. S. J. Boyd, the wife of William Boyd, testified on this branch of the case, in part, as follows: "We talked the matter over several times. I don't know how many times. During his last illness he seemed to be interested in my condition, and wanted me to have a living out of what he had worked and made." She was asked this question: "Q. You say he wanted you to have a living during your life and after your death, he wanted Berry and Haco to have the property equally divided between them?" "A. It is." "Q. You were present and saw and heard what took place; isn't it a fact that what he wanted to do, and attempted to do, was to fix his property so you could have the use of

it during your life and at your death Berry and Haco could have the property in equal parts?'' ''A. Yes, sir.''

On redirect examination she was asked this question: ''Q. Is it, or is it not a fact, that the understanding was that the property was to be deeded to Berry and by Berry to you without any limitations or restrictions, and that you have the property now, both real and personal, in your own name, and in your own right to dispose of it as you see fit?'' ''A. Yes, sir.'' ''Q. Then when you say that it was your husband's intention that the property should be divided at your death, you mean to say that your husband trusted you with the property under Berry's management to do right both between Haco and Berry when you die?'' ''A. Yes, sir.''

C. A. Boyd testified, and it was undisputed, that in carrying out the intention of his father the deed was executed to him (C. A. Boyd), and that he had since executed a warranty deed to his mother. Now it will be seen that Mrs. S. J. Boyd, the beneficiary of these transfers, when testifying as to what the intention of her husband was as to the disposition of his property, stated that he wanted her to have a living out of what he had worked and made. It is true, in answer to a leading question, she stated that the understanding was that the property was to be deeded to Berry and by Berry to her, and that she was to have the property, both real and personal, without limitation or restriction, and that her husband trusted her with the property, under Berry's management, to do right both between Haco and Berry when she died.

(2) Now as between her apparently conflicting statements, the statement that she made without the prompting of a leading question and without suggestion should have the greater weight, and that was to the effect that it was her husband's wish that she was to have a living out of the property; that is, as she afterwards explained, to have the use of it during her life, and that

after her death Berry and Haco should have the property in equal parts.

No one corroborates the testimony of C. A. Boyd to the effect that it was the intention of his father to transfer the property to S. J. Boyd without restriction. But, on the other hand, there is much testimony tending to show that it was the intention of William Boyd that his wife, S. J. Boyd, should have a life estate in all of his property, which, at her death, should descend to the son, C. A. Boyd, and the grandson, Haco Boyd. Mrs. Boyd herself stated that her husband's feelings were in no way estranged towards Haco's father or Haco himself, and C. A. Boyd testified that his father was very proud of and very fond of Haco. Haco testified that his grandfather told him the last Thursday before his death that he wanted him (Haco) to share equally with his grandmother and uncle Berry; that the summer before he died he was with him every time he could get a chance, and that his grandfather had great affection for him. The mother of Haco testified that Haco was a favorite with his grandfather Boyd; that she heard the grandfather frequently say that he was going to educate Haco just as he had his own sons, Berry and Roy (Haco's father), and that he wanted Haco to have the same share in his property as Berry and his grandmother. She stated that she heard the conversation between Haco and his grandfather on Wednesday before he died, and that grandfather Boyd ended the conversation by saying, "When grandpa dies he wanted him (Haco) to share equally with his grandmother and uncle Berry."

Several other witnesses who were not relatives and who were disinterested, stated that the grandfather Boyd manifested great affection for his grandson Haco. Several of these stated that he seemed to think as much of Haco as his own child, and they heard him so express himself time and again. Several of these stated that they heard William Boyd say that after his death and his wife's death that he wanted his son and grandson to share equally.

J. M. Boyd, a brother of William Boyd testified, ''I was present Sunday and Sunday night when William Boyd disposed of his property. Well, I heard the conversation, and, as I understood, the property was to be made over to Berry and from him made over to his mother during her lifetime, and then be divided between Berry and Haco, his grandson.'' True, in answer to a leading question, witness stated that he (witness) understood that William was giving to his wife an absolute right and trusting to her to do what was right between Berry and Haco.

(3)   The testimony in regard to the previous declarations of William Boyd as to the manner in which he expected to dispose of his property at his death and of his intention that his wife should have a life estate therein, and that after her death it should be divided equally between his grandson and Haco and his son Berry, was competent.

In *Howe* v. *Howe, et al,* 99 Mass. 88, it was held: ''To impeach the validity of a deed, evidence of declarations of the grantor, while of sound mind, prior to the execution of it, as to his intentions concerning the disposal of the granted premises, is admissible when offered 'among other circumstances tending to prove unsoundness of mind, undue influence and fraud;' especially if it is a deed of gift disposing of the grantor's estate among his children and omitting any provision for the issue of a deceased child.''

(4)   Now a clear preponderance of the evidence shows that in making final disposition of his property it was the intention of William Boyd to convey to his wife a life estate with remainder over to his son and grandson. While the deed itself is not set forth in the abstract, the complaint alleges that it was an instrument of writing which purported to be a warranty deed, conveying from William F. Boyd and S. J. Boyd to C. A. Boyd the real estate described in the complaint. Such a deed was not the instrument, according to the pre-

ponderance of the evidence, that Wm. F. Boyd intended
to execute.

The justice of the peace who took the acknowledg-
ment testified, among other things, that the deed which
C. A. Boyd had first prepared, and which had been read,
and the deed which he supposed was being acknowledged
by William Boyd, was not complete; that it described only
one of the lots and "all other real estate." None
of the witnesses who were present at the time it is
alleged that the deed was executed testified that the
same was read over to Wm. Boyd and that he stated in
their presence that he understood the instrument. The
justice of the peace himself, while stating that he took
the acknowledgment, does not state that the deed was
read over to Boyd and that Boyd stated that he under-
stood it. On the contrary, as before stated, the testimony
of the justice tends to show that the deed which he
thought was being acknowledged, was incomplete in that
it failed to describe the real estate.

As we view the record, there is no testimony, except
the testimony of C. A. Boyd, which tends to prove that
William F. Boyd knew and undertook at the time he exe-
cuted the deed and made the transfers, that he was mak-
ing an absolute conveyance of the real estate and trans-
fer of the personal property to C. A. Boyd. The pre-
ponderance of the evidence shows that it was not his
intention to make such a disposition of his property.
and therefore it must be held that these deeds and trans-
fers were not the acts of Wm. F. Boyd.

(5) It is shown that the mother and father both
reposed great confidence in C. A. Boyd, but there is
nothing in the record, or even in the testimony of C. A.
Boyd, himself, to justify the conclusion that William
Boyd intended to have the instruments evidencing the
transfers drawn in such a way as to entrust C. A. Boyd
with the duty of disposing of his property after his death
in such a manner as to effectuate his declared purposes
during life. While there is some testimony to show that
William Boyd intended to transfer the absolute title

to his wife, S. J. Boyd in trust to carry out these purposes, there is no testimony whatever to show that he intended to put the absolute title in C. A. Boyd. Yet that was the effect of the transfers in controversy, and, as such, the intention of William Boyd was not carried out. The deed and the transfers that were made did not even vest the title in trust in Mrs. S. J. Boyd. But absolute title, by the purported transfers of Wm. F. Boyd, was vested in C. A. Boyd. Nothing that C. A. Boyd could do after the death of his father would validate these transfers and make them the acts and deeds of his father.

Now the testimony shows that Mrs. Boyd and C. A. Boyd were dealing with the property as if the absolute title was vested in Mrs. S. J. Boyd. C. A. Boyd, it appears from her testimony, "has the absolute management and control" of her money, property and financial affairs. She stated, "He is taking care of it for me and handling it for me." The chancellor found, and the testimony shows, that C. A. Boyd had taken the personal property, amounting to nearly $8,000, outside of the State and invested the same. It thus appears that Mrs. S. J. Boyd, through C. A. Boyd, was exercising absolute dominion over the property.

(6) Even though a preponderance of the evidence may not show that William F. Boyd was positively *non compos* or insane at the time the purported instruments were alleged to have been executed by him, yet he was so weakened by the ravages of disease that, as one of the witnesses said, "he could turn his head only; he could not raise his hands. He was not able to trace the signature; they had to hold his hand and do that for him."

The doctor testified that he had been kept alive for several days on strychnine and caffeine; that his mind was weak in proportion as his body was weak.

A deed executed under such conditions, when challenged, should be scrutinized with the greatest care. Mr. Pomeroy says: "Finally, in a case of real mental weakness, a presumption arises against the validity of the

transaction, and the burden of proof rests upon the party claiming the benefit of the conveyance or contract to show its perfect fairness and the capacity of the other party.'' 2 Pomeroy Eq. Jur. sec. 947. See *Graves.* v. *White,* 63 Tenn. 38.

(7) After appellees had shown the extreme weakness of body and mind under which the transfers in controversy were alleged to have been executed it then devolved upon C. A. Boyd, who was named as the beneficiary and grantee in those instruments, to prove their validity. This he has not done by testimony which preponderates over the testimony on behalf of appellees tending to prove that C. A. Boyd drafted the instrument not in a way to effectuate the declared purpose of William Boyd in the disposition of his property. The case comes well within the doctrine announced in *Kelly's Heirs, et al,* v. *McGuire,* 15 Ark. 555-603, as follows: ''If a person, although not positively *non compos,* or insane, is yet of such great weakness of mind, as to be unable to guard himself against imposition, or to resist importunity or undue influence, a contract, made by him under such circumstances, will be set aside.''

(8) Since the preponderance of the evidence shows that there was no intention upon the part of William Boyd to execute a deed to the real estate and the transfers of the personal property to his son C. A. Boyd, these instruments are not the acts of Wm. F. Boyd at all and are not susceptible of reformation. Moreover, the pleadings did not warrant the court in decreeing a reformation of the instruments, and the proof was not sufficient to warrant such relief under the prayer for general relief. The court should have found the instruments void and entered a decree to that effect.

The judgment will therefore be reversed and remanded, with directions to enter a decree cancelling the deed and transfers of personal property, and for such other and further proceedings as may be necessary according to law and not inconsistent with this opinion.