**ETCHEN et al. v. THE TEXAS CO. et al. ETCHEN et al. v. PRAIRIE OIL & GAS CO. et al.**

No. 9654—Opinion Filed May 24, 1921.

(Syllabus.)

**1. Insane Persons—Conveyances—Validity —Mental Incapacity—Scope of Inquiry.**

Where the mental incapacity of a grantor is a material issue, in an action to cancel a conveyance for incompetency, evidence as to his weakness of mind is not confined to the date of the conveyance, but may go to any period of his life, prior and subsequent to the conveyance.

**2. Same—Physicians as Witnesses—Scope of Cross-Examination.**

Certain non-resident physicians, specialists in mental diseases, having had an alleged incompetent under their care, and having examined and treated him at different times and during different periods, and testified as to his mental capacity as they found it to be, were asked, on cross-examination, whether they knew what constituted legal incompetency under the laws of Oklahoma, and whether they knew that the alleged incompetent had been adjudged to be competent by the courts of Oklahoma. On objection to these questions they were not required to answer. Held, it was immaterial whether they knew what the statutes of Oklahoma provided, or whether they knew what the courts of Oklahoma had decided, and it was not reversible error to sustain the objection.

**3. Trial — Separate Findings and Conclusions—Time for Request.**

Where a request for separate findings of fact and conclusions of law is not made until after the court has announced what the judgment will be, it is not reversible error to refuse such request.

**4. Same—Statutory Requirements—Compliance.**

Section 5017, Rev. Laws 1910, (a) Does not mean that a party to a suit is entitled to the

specific findings of fact and conclusions of law which he may request.

(b) It requires merely that "the court shall state, in writing, the conclusions of fact found, separately from the conclusions of law."

(c) It requires no more than that the material and controlling facts and conclusions, as found by the court, shall be so separated as to render them distinguishable, thereby enabling a party to except to any particular finding, or conclusion, as may prejudice his rights, and to point out and assign same in case of appeal.

(d) Where a court dictates into the record, in such intelligible manner or form as to render them distinguishable, the material facts as he views them and what his conclusions of law are, he has substantially complied with the statutes.

**5. Insane Persons—Judgments of Competency—Effect—Presumptions.**

The rule that a former judgment, adjudging a person to be mentally competent, raises a presumption which must be overcome by clear and convincing proof, does not apply with full force where there have been several adjudications of the same question, some prior and some subsequent to the adjudication relied upon. The court may consider them all in connection with other evidence in determining whether the person is competent.

**6. Cancellation of Instruments—Grounds— Sufficiency of Evidence.**

In an action to set aside a conveyance, where it is apparent from the evidence that the effects of "constant intoxication," "undue influence," and "natural weak-mindedness" of the grantor have so combined as to make it apparent that such conveyance was not the free and voluntary act and deed of the grantor, but was a helpless yielding to the mastering influence of the grantee, a court of equity will set such conveyance aside.

**7. Appeal and Error—Review of Evidence— Equity Cases.**

In an action invoking the equity powers of the trial court, this court will review and weigh the evidence but will not reverse a judgment unless it be against the clear weight of the evidence.

Error from District Court, Nowata County; Conn Linn, Judge.

Actions by L. A. Keys against the Texas Company and against the Prairie Oil & Gas Company to recover royalties. Various persons made parties, among them Frank C. Elliott, original allottee of the land, who, through guardian, filed cross-action claiming the royalties and asking cancellation of various conveyances affecting the land. Judgment for Elliott and David Etchen, and others bring error. Affirmed.

Denton & Lee and McGinnis & Molony, for plaintiffs in error.

W. H. Kornegay and W. A. Chase, for defendants in error.

HARRISON, C. J. This case involves title to a Cherokee allotment, on which oil and gas wells have been operated.

Two suits, L. A. Keys v. The Texas Co., and L. A. Keys v. Prairie Oil & Gas Co., were begun in the district court of Nowata county, to recover royalties which Keys alleged to be due him from the oil companies. The oil companies each answered, and, upon their motion, various other persons were made parties to the suits, among whom was Frank C. Elliott, the original allottee, a quarter-blood Cherokee, who, through his guardian, filed answer and cross-action in each case, claiming all the royalties himself, and asking that all leases, deeds, and other instruments of conveyance of the land from him be canceled as a cloud upon his title. The two cases were consolidated and tried, and judgment rendered in favor of the allottee, and from such judgment both cases come here in one appeal.

While the actions were begun in the first place for the recovery of royalties, they ultimately turned upon and were decided upon the invalidity of the conveyances from the allottee.

Several different conveyances of the land, in one way or another and by different persons, had been obtained from the allottee, some being oil and gas leases, some assignments, some contracts of sale, and some warranty deeds. The trial court held them all void and ordered them canceled. Some were held void because on the date of their execution the allottee was a minor, and all the others void on the ground that both before and after attaining majority the allottee was incapacitated from excessive drink and acute alcoholism, and being non compos mentis, naturally was incapable of exercising control of his own judgment, and that the conveyances were not made by him as his own free and voluntary act and deed, and were therefore invalid.

Numerous errors are specified and assigned, 28 in number, but the controlling question before the trial court was, and before this court is, whether this allottee had sufficient mental powers to protect himself against the wiles of those who obtained the various instruments of conveyance from him. The assignment of errors is grouped into five propositions or points, the first of which being: That the court erred in admitting the testimony of Doctors Atkins, Whepler, and Morfit as to the mental condition of the allottee subsequent to January 1, 1915, said date being subsequent to the date of the conveyances in question. As to

this contention it appears that two of these witnesses, Doctors Atkins and Whepler, were specialists in the treatment of mental diseases; that they duly qualified as expert witnesses and showed themselves qualified specialists in this class of diseases, one having actively specialized in the treatment of mental diseases for a period of ten years, and the other 23 years. The third witness, Dr. Morfit, had been actively in the general practice of medicine 22 years, and showed himself thoroughly versed on the question. Besides, each of these doctors was personally acquainted with the allottee, and had treated him at different periods for mental weakness and acute alcoholism. Each testified as to the effect which prolonged and excessive use of alcohol had had upon the patient's mind, and also testified as to the normal strength of his mind after having been cured of the effects of alcoholism. Hence, their testimony as to the natural mental capacity in its natural state was competent for whatever probative force it might have. The admissibility of their testimony is contested on the ground that their knowledge of the patient was acquired subsequent to the execution of the conveyances, this contention being based mainly upon the assumption that the conveyances were held void solely upon the ground of his intoxication at the time they were made, and that testimony as to his being incapacitated from alcoholism at a time subsequent to the date of conveyances was not competent to show whether or not he was too drunk to know what he was doing at the time he made the conveyances. But it must be borne in mind that the validity of the sundry conveyances made by him was attacked not only upon the ground that he was drunk at the time they were executed, but also upon the ground of inadequacy of consideration and the ground that by nature he was weak-minded, normally incompetent, and without mental powers to protect himself against the persons who had procured the conveyances from him. His natural weak-mindedness and mental incapacity being a material issue, testimony as to his mental powers in their natural and normal state at any period of his life was competent. His mind, his mental endowments by nature and for life, being the issue before the court, testimony as to the strength of his mental powers should not be confined to any particular period of life. Anderson v. Cranmer, 11 W. Va. Rep. 562; Boyd v. Boyd (Ark.) 184 S. W. 838. Jones v. Travers (Ark.) 172 S. W. 828; Paulus v. Reid (Iowa) 96 N. W. 757; 18 C. J. 219; State v. Wright (Iowa) 84 N. W. 541; Blume v. State (Ind.) 56 N. E. 771; Wigmore on Evidence, vol. 1, sec. 228; Sprinkle v. Wellborn (N. C.) 52 S. E. 666; Lyons v. Van Riper,

26 N. J. Eq. 337; Cruise v. Christopher, 5 Dana (Ky.) 186; Beach v. Wilton (Ill.) 91 N. E. 492; Roby v. Colehour (Ill.) 25 N. E. 777; 18 C. J. 237, sec. 164.

In Wigmore on Evidence, vol. 1, sec. 228, it is said:

" 'Upon this I believe that no difference of opinion will be found to exist,' said Mr. Justice Patterson in a celebrated case, 'as to the principle on which such evidence is admissible. Every act of the party's life is relevant to the issue.' "

In State v. Wright, supra, the court said:

"In all cases involving the question of mental capacity, it is competent to go into the minutest details of the personal history of the individual."

In Anderson v. Cranmer, supra, the court said:

"The point of time to be looked to by the court or jury in determining the competency of a grantor to make a deed·is that when the deed was executed; but the condition of the grantor's mind, both before and after the execution of the deed, is proper to be considered in determining what was his mental condition at the time the deed was executed."

On the question as to the grounds for setting aside a deed the Iowa Court in Paulus v. Reed, supra, in the body of the opinion, said:

"But it is not necessary in order to defeat a contract, that weakness of mind amounting to positive idiocy or insanity be shown. If it appears that there is a mental deficiency so marked as that the conclusion is justified that the party has not exercised any deliberate judgment concerning the transaction in question, but, on the contrary, has been simply as putty in the hands of a stronger will, then it cannot be said that a contract has been executed. A vital element is lacking, in that there cannot then be said to have been any meeting of minds. Out of such a transaction there is presented the product of but one mind."

On the same question, in Jones v. Travers, supra, the Supreme Court of Arkansas said:

"A grantor, though not positively non compos or insane, may yet be so weak mentally as to be unable to guard himself against imposition, or to restrain importunity or undue influence; and, if so, whether such incapacity is caused by temporary illness, general mental imbecility, natural incapacity, the infirmity of extreme old age or those accidental depressions which result from sudden fear, constitutional despondency, or overwhelming calamities, he is nevertheless incompetent to execute a deed."

The foregoing authorities not only support the latitude which the court allowed in the admission of testimony, but also sustain the court in its conclusion that the improper influence and domination over the weak mind of the allottee by Etchen, considered in the light of all the circumstances, constituted grounds for setting aside the conveyances.

The second point urged is that the court erred in refusing to permit counsel to cross-examine witnesses, Dr. Atkins and Dr. Morfit, as to whether they knew what constituted legal incapacity under the laws of Oklahoma; whether they knew that majority rights had been conferred on the allottee by a district court of Oklahoma; and whether they knew that allottee had been declared to be a competent person by the county court of Nowata county.

As to whether these doctors knew what the law of Oklahoma was, or what the courts of Oklahoma had said in reference to the allottee, was wholly immaterial to the issue then under consideration. The issue being the natural mental capacity of the allottee as they had found it to be in their examination and treatment of him, hence the refusal to permit them to be cross-examined on these questions did not prejudice the rights of plaintiffs in error nor constitute reversible error.

In point three plaintiffs in error contend that the court erred in refusing their request for separate findings of fact and conclusions of law, and in refusing to state in writing the conclusions of fact found, separately from the conclusions of law.

As to the merits of this contention it appears from the record that the case was tried and submitted to the court on March 28, 1917, that the court took the matter under advisement until June 19th, upon which date he rendered judgment. No request for separate findings was made in the meantime, nor until after the court had announced what his judgment would be. Then counsel requested the court for separate findings of fact and conclusions of law. The court declined the request, but dictated, among other findings, the following statement and findings into the record:

"Let the record show, Mr. Reporter, that the request for specific findings of fact and conclusions of law will be denied, for the reason that the same comes too late. The court finds and holds that the same should have been made and the court should have been informed at the time the case was being tried, that the request would be made. It is unfair to the court to ask, at this time, when the case was tried in March, and taken under consideration until this time. It is when the court is ready to render his decision and give the reasons, that this request is made."

After some further statements by the court, and colloquy between the court and counsel, the court made the further statement, to wit:

"Now it is admitted and conceded I think by everybody, that this boy was an Indian member of the Cherokee Nation, duly enrolled, of one-quarter blood, Cherokee Indian, and that he became of age under all the conditions and contentions of everybody, on the 26th day of January, 1911, so there is not any controversy about that issue.

"I think all these deeds made prior to that time are absolutely void. I do not see any other way, or how any other contention can be in good faith asserted. He was under restrictions and he could not make a good and binding deed until he was 21 years old because then, possessed of sufficient mental capacity to do it.

"Now you take the beginning of all these deeds—three or four in 1909, beginning along about the middle of the year in June, June the 17th was the day when all this trouble started about these various deeds and leases, and contracts for sale and assignments, that clouds this title, because it was on the 17th day of June, the day the majority rights were conferred on him by the district court—right that very day was the day he commenced making these deeds and conveyances, and they came pretty thick and fast after that time. The proof shows to my mind this fellow was nothing more nor less than a common drunk, and he didn't have any more will power to resist it than a child would have when you put anything in its mouth. He was sober at times—there is no doubt about that.

"In the first place, he started mentally weak. I do not believe this man ever did have the mental strength beyond that of a fifteen year old boy. I think he was absolutely and completely in the hands of these parties that got hold of him in that condition, and was in their hands as clay. The dates of these deeds absolutely show it. If you just arrange them in the order in which they come, and see how they come together, it is conclusive to my mind.

"From the proof in this case I think that he was just as susceptible to the influences of the defendant, Etchen, as any five year old child ever was under the influence of its parent. Now Etchen claims he got the deed back in 1910, and went into possession, and was in possession of this property, holding it adversely against the claims of all persons at the time this boy arrived at age, and made a subsequent conveyance. The proof on that question of possession to my mind shows that it was the act of a sharp, smart fellow trying to take advantage of this boy. He did not go out there like a man in good faith who bought the property and paid for it. He went sneaking over in there like he was trying to take something away."

After some further comment as to what the testimony showed, and the conclusions which he drew from the testimony, and the actions of the party, the court further stated:

"Now that is all there is to it. Just bring in a three year old child and lay down a bundle of red candy before it, and tell it not to touch it, don't touch it, now that is the condition.

"I know some of you don't agree with me, of course, but I am giving you the benefit of my candid unbiased judgment. I think every one of these deeds—I think that the deed first made to his sister and brother, was made at a time when he did not have sufficient mental capacity to know and realize the effect of the instrument he was signing."

"Now then, going back to this transfer to this man Keys. I don't know him, and I don't want to do him any injustice or any wrong, but the proof shows there was $5,000 somewhere in there of this oil that at its market price was worth that much money at that time, the date this transfer was made to him, and he paid right around $200 in cash, and gave a due bill of $1,500.00, payable when this royalty was collected. That is what the proof shows. Where the due bill is, nobody knows. He says, 'Elliott has the due-bill, so far as I know—I made it out and gave it to him,' and I guarantee it is not in existence. That is a good deal worse than buying gold dollars at 90 cents apiece—a good deal worse. For me to give my approval of the sale of $5,000 in money or its equivalent in any bank in this country for $200 and a due-bill for $1,500, is against my conscience, and I could not do it. I could not go home and meet my wife if I did. Now that transaction—that shows the weakness of the boy. I think that transaction ought to be and should be set aside. It is not only inadequacy of consideration, but it is insufficient mental capacity to make a deed, and it is the rankest kind of deal.

"It is the judgment of the court that these deeds be set aside, even the deeds to the trustees, because I think those deeds were procured just for the asking on the part of this sister and brother, who may have been in good faith. This boy, although he has gotten some money out of it—that may be all true, but these parties took their chances. They knew he had been restored to competency when he was nineteen years old, and that he had had a guardian or two, and was non compos mentis. Let all these deeds be set aside and held for naught, and that includes the deeds to the brother and sister, Ed Elliott and Mrs. Cumpston, and the transfer of royalty set aside and the property restored back to the guardian and held for Frank Elliott."

The court was brought to the above viewpoint from having heard all the evidence, and having had the case under consideration for a period of almost three months, and having reached such viewpoint from the evidence and from a careful consideration of all the circumstances and conditions, he rendered judgment decreeing the cancellation of all the instruments of conveyance which had been procured from the allottee.

As to whether plaintiffs in error were entitled to separate findings of fact and conclusions of law at the time the request was made, and whether they were substantially prejudiced by the refusal, depends upon the provisions of section 5017, Revised Laws 1910, upon whether the request was made in due time, and lastly, whether, as a matter of fact, the court did make separate findings in substantial compliance with the statute; section 5017 being:

"Upon the trial of questions of fact by the court, it shall not be necessary for the court to state its findings, except generally, for the plaintiff or defendant, unless one of the parties request it, with a view of excepting to the decision of the court upon the questions of law involved in the trial; in which case the court shall state in writing, the conclusions of fact found, separately from the conclusions of law."

This statute does not mean that a party to a suit is entitled to a finding of just such facts and every fact, and just such conclusions of law and only such conclusions, as he may request, nor such findings only as may suit his particular view of the case. The statute does not mean any such thing, nor is the court required to make just such findings as may be requested, any more than it would be required to give just such instructions as might be requested by a party to a suit. Nor does the statute provide that such findings as the court may make, or does make, shall be in any particularly specified form, style, or verbiage It requires merely that "the court shall state in writing, the conclusions of fact found, separately from the conclusions of law:" It requires no more than that the material and controlling facts and conclusions of law, as found by the court, shall be so separated and distinguished as to afford the party affected an opportunity to except to any particular finding of either fact or law, thereby enabling him to assign and point out such finding or conclusion as error in case of appeal; and where a court dictates into the record, in such intelible manner or form as to render them distinguishable, what the material facts are, as he views them, and what are his conclusions of law in reference thereto, he has substantially complied with the statutes and given the party his substantial rights under same.

In our opinion, the findings which the court dictated into the record constitute a substantial compliance with the statute. They embody every fact involved in the case necessary to a determination of the issues. The findings of fact are easily distinguishable from the conclusions of law. Likewise, the conclusions of law, as set out in the journal entry of judgment, are clearly distinguishable from the findings of fact. If any particular fact found had been deemed erroneous or prejudicial to the rights of plaintiffs in error, such finding could have been excepted to and assigned here as error. The same is true as to every conclusion of law. But plaintiffs in error are not complaining here of the failure of the court to make a finding as to any particular fact, nor is complaint made as to any particular fact found by the court, nor do plaintiffs in error point out any particular fact which was requested and refused, wherein their rights were thereby prejudiced, but come to this court on the general proposition that the court erred by refusing the request made. In other words, plaintiffs in error are urging reversal merely upon the ground that the court refused to make separate findings in the particular form which they requested. We cannot say this constituted reversible error. The request was not made until after the court had announced what its judgment would be.

In Beck v. Finley, 77 Okla. 213, 187 Pac. 488-9, this court said:

"No error can be predicated upon the refusal of the court to make the special findings of fact requested, for the reason that no request was made therefor until after the court had announced what his judgment would be—" following the holding in this court in German State Bank of Elk City v. Ptachek, 67 Oklahoma, 169 Pac. 1094.

Plaintiffs in error have not pointed out wherein they have sustained any substantial injustice, nor are we able to see wherein they have sustained any substantial injury or have been deprived of any substantial right. Hence, the authorities cited in support of their contention are not applicable here.

As to point four: That the judgment of the county court adjudging the allottee to be a competent person raised a presumption of law which should be overcome by clear and convincing evidence—while perhaps true as a general proposition of law, is not applicable here, or at least not controlling, for the reason that there had been several adjudications in reference to this boy's mind and his competency to manage his estate, one of which being subsequent to the adjudication relied upon by plaintiffs in error. In fact, this cross-action was instituted by a guardian, the allottee being legally incompetent to do so.

The presumption is that the court took all these matters into consideration in passing upon the question whether the allottee was naturally endowed with, or by nature deprived of, sufficient powers of mind to protect himself against those who designed against his estate.

As to the fifth proposition or point; "That the court erred in overruling the demurrer to

the evidence, and that the judgment is contrary to the weight of the evidence—" these questions go to the entire case, to all the evidence and proceedings considered as a unit. Considering the entire record in this light, we are of the opinion that the judgment of the trial court should be sustained.

Each of the doctors who had treated him stated that he was mentally weak, naturally; that he had the mind of a boy of 16 or 17 years of age, one saying 12 to 15 years; that his mind was not fully developed; did not think he was capable of transacting his own business; did not consider that he ever was or ever would be capable of taking any responsible action. One of the doctors, when asked as to the patient's knowledge of values, said: "I believe I have given him money when he asked for it, small amounts, but I believe I could get him to sign most any kind of a proposition I would put up to him if I talked to him for ten minutes."

Another witness, Mr. Elrod, banker and farmer who lived at Lenapah, testified that he had known the allottee ten or eleven years, had observed his habits of drinking eight or nine years, that he was drunk all the time he possibly could get drunk. In reference to the circumstances of Etchen's procuring a deed from Elliott, this witness stated: "I stepped out of the back door of the bank on the side of the bank, on the sidewalk leading to the court house, and met Mr. Etchen. There then considerable talk about the execution of the deed and I had talked with him prior to the trouble he was having with his deeds, and he says: 'Well, I have another one if this one is no account.' And showed me the deed, and says: 'It didn't take all my roll either.' He had quite a roll of bills. I passed a few remarks and passed on and just as I passed on I met Frank Elliott very drunk. They were coming from toward the court house in the afternoon."

Also, the witness Dr. Waters, who had been in the practice of medicine 30 years, and who had known Frank Elliott about 12 years, and who testified that he had seen him almost every day, and that he had frequently attended him for alcoholism. "jim jams," as he called it, and in answer to the question as to what business the boy engaged in, said: "All he had was just get drunk of a morning and stay drunk until about 12 or 1 o'clock; really the fellow hardly ever got sober." This, it is observed, covered the period during which the various conveyances were obtained

There was also testimony sustaining the court's conclusion as to the influence exercised over the allottee by plaintiff in error Etchen. On the other hand, there was evidence on the part of plaintiff in error contradictory of all these facts. But from an examination of the record as an entirety, viewing this boy in the plight which nature

and bad habits had placed him, and in that condition pitting him against Etchen in a business transaction, considering the inadequacy of consideration as found by the court, considering his apparent lack of mental powers, and his total absence of will power, further weakened by excessive drunkenness, and all this in connection with the number of conveyances procured from him by Etchen, and the attitude of Etchen toward him, and his influence over him, we cannot say that the judgment was against the clear weight of the evidence. We cannot say, in the light of all the evidence, that the conveyances in question were the free and voluntary act and deed of the allottee; nor that it is clear under the evidence that the allottee had sufficient strength of mind to protect himself against the undue influence of those who sought his land. We do not think so.

The rule that a conveyance will not be set aside on the single ground of "intoxication," or of "inadequacy of consideration," or "undue influence," or "weak-mindedness," except upon a clear preponderance of evidence, does not obtain where all these forces combine against one naturally weak-minded, so as to render it apparent that the conveyance was not the free and voluntary act and deed of the grantor, but rather was a helpless yielding to the mastering influence of the grantee. The authorities cited by plaintiffs in error are not applicable to the conditions here disclosed. The rule of this court that, although this court will examine the record and weigh the testimony in an action invoking the equity powers of the trial court, yet will not reverse the judgment of the trial court unless it appears to be against the clear weight of the evidence, is peculiarly applicable here. In our opinion the judgment is supported by the weight of the evidence.

The judgment is affirmed.

PITCHFORD, McNEILL, MILLER, and NICHOLSON, JJ., concur.