## ROSS v. ROSS.

No. 26304. Feb. 4, 1936.

634

Glass & Chappell, for plaintiff in error.

Bruce L. Keenan, for defendant in error.

PER CURIAM. July 18, 1934, Motto Ross. as an incompetent and insane person, by J. Walter Davidson, guardian, sued Myrtle Ross for annulment of the marriage of the plaintiff and the defendant, on the ground that plaintiff at all times since 1919 had been wholly incompetent mentally to enter into said marriage contract.

Myrtle Ross filed a general denial and further pleaded that she and plaintiff were married at Nowata November 7, 1922; that if plaintiff was an incompetent person at that time. he was restored to competency by the county court of Cherokee county November 7, 1923, and that he was normal, capable and competent, mentally and otherwise, and had full possession and control of his mental faculties, until April 18, 1927; that the parties lived. resided, and cohabited as husband and wife continuously until October, 1926; that if he was incompetent at the time of the marriage, he ratified and confirmed the marriage after his disabilities had been removed. Plaintiff by his reply joined the issues, and upon verbal and documentary evidence the case was submitted to the court. The marriage was annulled and Myrtle Ross has appealed.

Chapter 13 on the subject of Marriage, section 1666, O. S. 1931, declares that marriage is a personal relation, arising out of a civil contract to which the consent of parties legally competent of contracting and entering into it is necessary. and that the marriage relation is only to be entered into, maintained or abrogated as provided by law.

Legislative permission runs to males 21 years of age or over and to females 18 or over who are "not otherwise disqualified." Other primary requirements are a license and a ceremony performed by clerical or official authority, with return duly recorded.

In said chapter certain marriages are forbidden in terms more or less positive. Between persons related within forbidden degrees, marriages are declared "incestuous, illegal and void and are expressly prohibited." Miscegenation is denounced as unlawful and is prohibited and penalized. It provides that no persons under the prescribed age "shall enter into the marriage relation," and males under 18 and females under the age of 15 "are expressly forbidden and prohibited from entering into the marital relation" unless with court sanction.

In chapter 3, Civil Procedure, dealing with Divorce and Alimony. section 677 provides that when either of the parties to a contract shall be incapable, from want of age or understanding, of contracting marriage, the same may be declared void by the district court in an action brought by the incapable party or by his guardian, and that cohabitation, after such incapacity ceases, shall be a sufficient defense to any such action. In the chapter on Guardian and Ward, under the subject of Incompetents and Insane. sections 1447-1449 provide that the judge of the county court must appoint a guardian of person and estate if the subject of the inquiry, after full hearing and examination, appears to be "incapable of taking care of himself and managing his property"; that the guardian "has the care and custody of the person of his ward and the management of all his estate until such guardian is legally discharged"; that the fact of his restoration to capacity may be judicially determined by the county court; that "if it be found that the petitioner be of sound mind and capable of taking care of himself and his property, his restoration to capacity shall be adjudged and the guardianship of such person, if such person is not a minor, shall cease." The chapter on Contracts, section 9404 provides:

"After his incapacity has been judicially determined, a person of unsound mind can make no conveyance or other contract * * * until this restoration to capacity is judicially determined."

Section 9391 provides that all persons are capable of contracting. except minors, persons of unsound mind, and persons deprived of civil rights.

October 31, 1919, said county court appointed Bruce L. Keenan guardian of Motto Ross, an incompetent and insane person. November 7, 1922, Motto and Myrtle were married at Nowata. November 7, 1923,

Motto was restored to competency by said county court and adjudicated to be sane and capable of transacting his business affairs. October 6, 1926, the chief of police of Tah'equah petitioned said county court for an order admitting Motto to a state hospital on the ground of insanity. He was committed and has so continued. November 30, 1926, Elizabeth E. Tyeska was by said county court appointed guardian of the person and estate of Motto, but she failed to qualify. April 19, 1927. E. D. Hicks was appointed guardian. January 10, 1931, J. Walter Davidson succeeded Hicks as guardian. May 20, 1931, the guardian filed petition in the county court wherein he alleged that his ward was an ex-soldier with total disability, and that he was drawing $100 per month compensation. He asked for authority to pay $20 per month to the hospital where his ward was confined, and $50 per month for the support of his ward's wife.

In 1919, after Motto Ross returned to Tahlequah from the army, he sold his land August 4th, 7th, and 11th, and went to Muskogee where he killed another negro August 12th. On the testimony of two doctors, on August 13th, he was declared insane, and on August 14th the Muskogee county court ordered him committed to an insane asylum. See opinion of this court in Keenan v. Scott. 99 Okla. 63, 225 P. 906, wherein said guardian unsuccessfully sought cancellation of the conveyances above referred to on the ground that the grantor was insane and incompetent at the time of the execution thereof.

Counsel for Myrtle Ross complained of the admission in evidence of a letter dated October 2, 1934, from the Veterans' Administration addressed to the guardian. Said letter gave at great length the medical record of Motto Ross, laboratory reports, comments, diagnosis, treatment recommended, mental, physical, and neuropsychiatric examinations. This evidence was admitted on the theory that it threw light on the mental condition of the plaintiff. We see nothing in the record to lift it above the level of ordinary correspondence between plaintiff's guardian and a third party. No authority for its admission has been cited. In our opinion it was hearsay and should have been excluded. 22 Corpus Juris, 820; sec. 334, O. S. 1931.

The record contains the verbal testimony of twelve witnesses, some of whom expressed their opinions of the sanity or insanity of the plaintiff and most of whom related facts and incidents concerning his mental irregularities and eccentricities,—some trivial, others indicative of nervous and mental derangement.

Plaintiff used six witnesses who testified to a variety of incidents which brought them to the conclusion that Motto Ross was incompetent. Their respective opinions were expressed in different ways: two regarded him insane; one considered him incompetent; one thought "he did not act in good mind": one "never thought Motto was right": another testified that some times he was all right. but "when spells would come he was off." that "most times" she considered him insane. Each witness related one or more nervous or mental manifestations which tended to support his opinion: nervous, high tempered, peculiar manner, eyes glassy, would not stand still and talk, put hand to back of head and said it hurt. As to hallucinations, oddities. and eccentricities, in the woods he hitched his horse to a tree and tried to pull it over and broke his double-tree; he became disgusted after bad luck fishing, threw down his line and declared that if he could not catch them one way, he would another, whereupon he dived into the creek and swam about in the water; he said he heard the (army) whistle to line up, whereupon witness and plaintiff lined up in the woods, and plaintiff then asked witness where they were going, and at witness' suggestion they went home; he had dreams in which something with fiery breath got after him in the night and kept him from sleeping; he said Sambo (the man he killed in 1919) was after him at night, and a little black thing with horns. in France, disturbed his sleep; he blew his horn a long time, then threw it on the floor and stomped on it; he threw rocks at a tree and said the Germans were after him.

In behalf of the defendant six witnesses, including Myrtle Ross, testified. Defendant testified that she visited her uncle in Tahlequah part of September and October, 1922, and saw plaintiff several times; that immediately after their marriage, November 7, 1922, they lived at her mother's home in Nowata; that at the time of marriage she did not know plaintiff was under guardianship, or that he was receiving a pension; that plaintiff worked at home and hired some help on the farm; that she cooked for him; that there was no trouble whatever between them, got along fine, and he always treated her well; that she left Cherokee county in the summer of 1926 to visit her mother and then went to Pawhuska where a relative had work for her; that before going she talked the matter over with Motto, who said he could not meet the farm expenses on

$45 per month he received from his pension and if she could get work they could go somewhere and do better; that if she found work Motto would come to her after gathering his 1926 crop; that she wrote letters to him and he assured her he would join her as soon as he could; that he came to the quarters she was occupying with Flora Glass in Pawhuska, spent the night with her and resumed marital relations; that he bought groceries there and told her he would sell out at Tahlequah but would bring his chickens and Victrola to Pawhuska; that she had written to and received letters from him since 1926.

Flora Glass corroborated defendant about plaintiff's visit to Pawhuska and of their arrangement to stay at her quarters until he could find another place in Pawhuska. She testified that plaintiff seemed normal and that she heard of no trouble between them.

Another witness remembered when plaintiff went to and returned from Pawhuska and left his stock with her husband to sell, and heard plaintiff say he would take his chickens and Victrola to Pawhuska and sell the balance. She testified that plaintiff seemed all right and talked normally in his home, and so far as she knew plaintiff and his wife got along well. Sis Ross testified that all the Rosses were out of line, crack-brained; that Motto was addle-brained, but knew what he was doing. Major Riggs testified that in the few dealings he had with Motto he acted normally; that Motto and his wife lived at his home for a time after marriage; that Motto was all right, if he thought you were on the square; if he thought you were his friend, he would go down for you. That Motto told tales of France in a crowd which sounded unreasonable and witness did not know whether he was "off" or having fun, but thought it was "considerable meanness." Robert Meigs testified that Motto came to witness' home after his return from Pawhuska and talked matters over. He said Myrtle was making $10 a week and he was getting $45 a month, and they would put their money together and do better than on the farm; that people in Tahlequah meddled with him and he was going to Pawhuska to live with his wife. Motto said he sold a horse for $19, to be delivered on payment of the money and directed witness to give the money to plaintiff's sister; that plaintiff got a book for his sister and one for witness and told witness to put down in the book what witness paid his sister and to keep things straight. Witness testified that plaintiff was

all right in his dealings with him after November 7, 1923, "because he did not get into any foolishness with him"; that Motto did not like to be joked, or teased, and was easy to get along with when not "mad"; was nervous and would walk away and refuse to talk; that the Ross family had funny ways; that Motto did not know anything about contracts and the general understanding was that he was a little off; that he never forgot anything, and that he was not as big a fool as people thought; that he told witness in jail the next morning that he was drunk the night of the shooting in (October) 1926, and was playing with his .45 and decided to have a little fun.

While plaintiff below contended that the marriage was void, and not voidable, he apparently assumed the burden of proving plaintiff's insanity and incompetency continuously from October 31, 1919, down to the time of trial, as he alleged in his petition, with special emphasis on his mental condition for the years 1922 to 1926, inclusive, during which last-named period he married while under guardianship, was restored to competency, and later was again adjudicated incompetent.

The conclusiveness of adjudications of incompetency and of restoration to competency, and questions as to changing presumptions and shifting burden of proof need not be gone into fully in view of the fact that plaintiff's mental competency has been the subject of inquiry on several occasions. In Etchen v. Texas Company, 82 Okla. 62, 199 P. 212 (quoted in 32 Corpus Juris 616), this court held:

"The rule that a former judgment adjudging a person to be mentally competent raises a presumption which must be overcome by clear and convincing proof, does not apply with full force where there have been several adjudications of the same question, some prior and some subsequent to the adjudication relied upon. The court may consider them all in connection with other evidence in determining whether the person is competent."

If the marriage was valid, it became so by virtue of the ceremony November 7, 1922, or by ratification after Motto's restoration November 7, 1923. If the marriage was void, it became so by statutory edict or by plaintiff's insanity in fact.

The parties were of legal age and willing and statutory formalities were complied with, but was Motto disqualified, as a matter of law, because he was an adjudicated incompetent and under the restraints of active guardianship at the time of the ceremony?

We answer this question in the negative. If marriage be viewed as an ordinary contract, and if full sway be accorded the literal terms of section 9404, plaintiff was shorn of power to marry between October 31, 1919, and November 7, 1923. Doubtless the guardian's power was exclusive in the field of common contracts concerning money and property. The reason for the rule is stated in Thorpe v. Hanscom (Minn.) 66 N. W. 1:

"This rule is based upon convenience and necessity for the protection of the guardian, and to enable him to properly discharge his duties as such. Without this rule it would be difficult, if not impossible, for the guardian to execute his trust, for in every action concerning the property of the ward he might be obliged to go before the jury upon the question of the ward's sanity, and one jury might find one way and another the other way."

Clearly the guardian must be free to act, without conflict or hindrance in all matters in which he is capable of acting, but his broad powers and duties necessarily falter at the gates of matrimony, whether it be designated a "contract" or "a personal relation arising out of a civil contract." A prohibited marriage was considered in Hunt v. Hunt. 23 Okla. 490, 100 P. 541, and it was held that marriage "differs to such an extent from all other contracts in its consequences to the parties and to the public that the rule that prohibited and penalized contracts are void does not apply thereto." From the body of the opinion we quote further:

"The rule to be gathered from all of the foregoing cases of this character is that, notwithstanding the statute may penalize those who solemnize or those who enter into marriage contrary to statutory authority, the marriage itself is not void unless the statute itself so makes it. and hence in the case at bar, although the marriage was expressly forbidden and prohibited, it was voidable, and not void."

Legislative provisions concerning contracts pertain primarily to property and property rights and do not invalidate marriage contracts. Especially is this true where the Legislature, in another chapter, has dealt with restrictions on marriage. Roether v. Roether (Wis.) 191 N. W. 576; 28 A. L. R. 631; 25 R. C. L. 1010; L. R. A. 1916C, 701-2.

In Missouri it is held that marriage is a civil contract but incapable of being made by a representative. and so peculiarly individual and personal in its nature that it is not within the purview of a statute which declares void the contract of an incompetent under guardianship. Payne v. Burdette, 84 Mo. App. 332; In re Guthery's Estate (Mo. App.) 226 S. W. 626; Westermayer v. Westermayer (Mo. App.) 267 S. W. 24; Wormington v. Wormington (Mo. App.) 47 S. W. (2d) 172.

In Fernow v. Jones, 34 Okla. 694, 126 P. 1015, the court said:

"We recognize the danger of undertaking to lay down a general rule, but it seems to us not far wrong to say that a marriage may be considered voidable when it is possible, under any circumstances, for the plaintiffs to contract the marriage, or subsequently to ratify it, while it should be considered void if it is impossible for them under the law to contract it, and if it is impossible for them subsequently by any conduct to ratify it, and if the statute expressly declares that it is void."

It is significant that the Legislature has not declared void the marriage of a party incapable, from lack of understanding, of contracting, but it has opened the door of relief by authorizing the district court to declare such marriage void at the suit of the incapable party or his guardian. And to bar injustice, it has coupled with the statutory remedy the wholesome provision that cohabitation, after the incapacity ends, shall be a sufficient defense to the action.

Plaintiff's evidence failed because it did not bear directly on the marriage contract sought to be impeached. Proof of occasional or frequent peculiarities, oddities, headaches, nervousness, nightmares, and hallucinations during the years 1922-26, coupled with the more remote evidence of his confinement since 1926 and of his commitment after the homicide in Muskogee in 1919, does not impeach his ability to know and understand the obligations and responsibilities of marriage. No fraud or deceit was practiced upon him. He became acquainted with Myrtle in Tahlequah, went to her mother's home in Nowata to marry her, lived with her in mutual good faith and harmony for nearly four years in Tahlequah and on a farm in Cherokee county, went to Pawhuska to see her when she got a job there in or about the summer of 1926, made normal arrangements for living quarters in Pawhuska for their use after he put by his crop in Cherokee county and sold his stock and chattels. They had tested farm life. It did not pay, although farm receipts were supplemented by $45 monthly from his pension. They decided her $10 per week in Pawhuska and his $45 per month made the Pawhuska outlook more attractive than the farm life.

Although of weak or low mentality, his deficiencies did not noticeably manifest themselves in his attitude towards his wife and home and in his willingness to undertake and meet the responsibilities of matrimony. Elliott on Contracts, vol. 1, p. 575.

"Mere insane delusions or hallucinations are not sufficient in and of themselves to annul a marriage; but before such a contract can be canceled on the ground of lunacy, or for want of understanding, it must be satisfactorily shown that the party in whose interest or right the action is brought was mentally incapable of understanding the nature, effect, and consequences of the marriage." Kemmelick v. Kemmelick. 186 N. Y. Supp. 3. See 28 A. L. R. 640-6.

Without regard to the evidence in general, if it be assumed that a presumption of insanity continued from the adjudication October 31, 1919, to the time of marriage, November 7, 1922, it must also be assumed that a presumption of sanity continued from the judicial restoration November 7, 1923, to the time of the last adjudication of incompetency late in 1926. If, for the sake of argument, it be conceded that the marriage was invalid, the evidence of cohabitation, after his judicial restoration, was sufficient defense to the action to annul. Section 667, supra; Gross v. Gross (Mo. App.) 70 S. W. 393; In re Gregorson's Estate (Cal.) 116 P. 60; Webster v. Webster, 114 Okla. 57, 242 P. 555; 18 R. C. L. 486-7.

This is an equitable action and the findings and decree below are contrary to the clear weight of the evidence. The decree whereby said marriage was annulled is therefore reversed, with directions to the trial court to vacate the judgment rendered and to dismiss the action.

The Supreme Court acknowledges the aid of Attorneys James W. Cosgrove and E. M. Calkin in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Cosgrove and approved by E. M. Calkin, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter. upon consideration, this opinion was adopted.

McNEILL, C. J., and BAYLESS, WELCH, CORN, and GIBSON, JJ., concur.