R. E. BELLAH and Lorene Bellah, husband and wife, Plaintiffs in Error,

v.

Clint C. COOKE, Guardian of J. W. Prater, Incompetent, Defendant in Error.

No. 38485.

Supreme Court of Oklahoma.

Nov. 17, 1959.

Rehearing Denied Dec. 22, 1959.

Percy Hughes, Hobart, for plaintiffs in error.

Walter H. Foth, Cordell, for defendant in error.

BLACKBIRD, Justice.

This appeal arose out of the cancellation of a deed to farm land, executed without monetary consideration, on February 3, 1958, by one J. W. Prater, who, at that time, was approximately one month less than eighty-five years of age, and was apparently beset with feebleness and infirmities more or less common to men of that age. Previous to this time, Prater had been considered thrifty and a good farmer and shrewd trader. He had accumulated 400 acres of farm land in Washita County, near Cordell, and was still residing on one of his farms when his wife died, in 1952. At the times material to the controversy here involved, Prater's only son and daughter were dead, and the only persons referred to in this action as his "heirs and next of kin" were his eight adult grandchildren, who were the four sons and four daughters of his deceased daughter, a Mrs. Bellah.

When Prater began to receive treatment from a physician, we shall refer to as Dr. J, in November, 1956, he was residing alone on the above-mentioned farm, and none of his grandsons or granddaughters lived in Washita County. At that time, he was bed-fast on account of ailments Dr. J referred to, in a general way, as "prostate" trouble. Before Dr. J's treatment terminated "about the first of January, 1957, * *" and for a period of "two or three months", Prater stayed in the home of one of his half-sisters, a Mrs. Mattie Morris, at Cordell.

By December, 1957, R. E. Bellah, one of Prater's grandsons, usually referred to as "Jack", had returned to southwestern Oklahoma, from working on construction jobs at other places, and he and his wife, Lorene, were residing at Altus. At their invitation Prater spent Christmas of that year in their home, and, after he returned to his farm home for one week, Jack brought him back to the Bellahs' home where he was residing when he began talking of giving Jack the land described in the deed in question. After Prater, during the few weeks that followed, had expressed to Jack, more than once, his desire to give him the land, and Prater had talked to one of Jack's sisters, Jewell Allen, of Altus, and to other persons about making such a gift, Jack and Prater went together to the abstract office of Mike Rainbolt, in Cordell, on February 3, 1958, where, at Prater's request, the deed in question was drafted. Said deed described one 80-acre tract, in addition to a quarter section of land, excepting 80 acres of minerals thereunder, "heretofore conveyed"; and, despite the fact that the conveyance was to effect a gift, said deed recited a consideration of $12,000; and, before it was recorded, federal revenue stamps sufficient for such a consideration were placed thereon.

Apparently within a short period from the date the above described deed was executed, Jack Bellah and Prater discussed whether or not Prater would prefer a residence in Rocky, Oklahoma, to living on the farm, and conceived the idea of buying a house at Rocky, for Prater's home. After they had looked at one there, whose list price was $3,000, they decided to buy it. Bellah thought he might be able to negotiate the purchase himself for $2,500, but, to provide sufficient funds to make the purchase in any event, Prater delivered to Bellah his personal check in the amount of $3,000, drawn against an account he had in the bank at Rocky. When this check was presented at a bank in Altus for payment, Clint C. Cooke, one of the bank's officials or employees, who had previously been consulted with reference to some of Prater's affairs, refused to cash it; and Attorney B was called to said bank to conduct an inquiry concerning the matter. When the attorney questioned Prater there, he denied giving the check, and thereafter, on the petition of one or more of Prater's grandchildren, other than R. E. (Jack) Bellah, Prater was declared incompetent in County Court proceedings; and, by its order entered February 20, 1958, that court appointed the banker, Clint C. Cooke, as Prater's guardian. On the 11th day of April, thereafter, Cooke, in his capacity of guardian, instituted the present action, as plaintiff, against R. E. ("Jack") Bellah and his wife, as defendants, to cancel Prater's above described deed of February 3rd, purporting to convey to said defendants 240 acres of his 400 acres of land, less an 80-acre mineral interest.

During the trial of the cause to the court, without a jury, numerous witnesses, both medical and lay, gave conflicting testimony and opinions concerning Prater's physical and mental condition both before and after the date of the execution and delivery of the questioned deed. During Bellah's interrogation, he explained the untrue consideration recital in the deed by saying: "* * * there's got to be a gift tax paid * * *" and: "I figured that was the actual value, or ground to pay tax on; you've got to have something to go on to estimate it to pay your gift tax." It was also indicated at the trial that Bellah had agreed to deed the land back to Prater, if

the other grandsons and granddaughters would agree to obtain appointment of someone other than Clint Cooke as Prater's guardian.

At the close of the trial, the court entered judgment for the plaintiff cancelling Prater's deed to the Bellahs, and the latter have perfected the present appeal. Our continued reference to the parties will be by their names, or trial court designations.

■ Defendants' position generally is that the sole issue at the trial was Prater's mental capacity to make the conveyance in question, and they contend that the trial court's judgment on that issue is clearly against the weight of the evidence. In determining the correctness of the latter contention, we will also deal with defendants' more specific charge that "there is absolutely no evidence to show" Prater's mental incapacity on "February 3, 1958, the date of the conveyance." Our attention is directed to the fact that the abstracter, Rainbolt, and the defendant Jack Bellah, were the only witnesses who were with, or in a position to observe, Mr. Prater on that date; and counsel says their testimony to the effect that he was competent at that time "should be conclusive as to the matter." We do not agree. We recognize the rule, cited by defendants, that the test of capacity to make a deed is the grantor's ability to understand the nature and effect of such act at the time it is performed, but we do not agree that competent evidence on this subject is confined to the testimony of those who saw him on that particular day. In Etchen v. Texas Co., 82 Okl. 62, 199 P. 212, 213–214, this Court quoted from Anderson v. Cranmer, 11 W. Va. 562, as follows:

"The point of time to be looked to by the court or jury, in determining the competency of a grantor to make a deed, is that when the deed was executed; but the condition of the grantor's mind, both before and after the execution of the deed, is proper to be considered, in determining what was his mental condition at the time the deed was executed."

In Mock v. Stricklin, Okl., 315 P.2d 247, 251, we followed the same principle and also quoted from Oklahoma Natural Gas Corp. v. Lay, 175 Okl. 75, 51 P.2d 580, and Marten v. Wagner, 198 Okl. 273, 178 P.2d 618, 619, showing that, under our statutes with reference to rescission of contracts, the guardian of an incompetent may obtain cancellation of a deed his ward executed when he was not entirely without understanding, and before he was judicially determined to be incompetent, without proving inadequacy of consideration, undue influence, etc., where the rights of third persons have not intervened.

While it is true that some of the testimony with reference to Mr. Prater's mental incapacity came from granddaughters whose personal interests, as said grantor's prospective heirs, might be served by his keeping all of his property, and some witnesses' opinions on that subject were rather equivocal, or impaired in probative value by other portions of their testimony, we think there was sufficient competent testimony from apparently disinterested persons to support the trial court's judgment.

■ In his brief, defense counsel expresses the view that Prater's competency may best be determined by examination of his own testimony. Counsel says that none of the evidence given by Prater was disputed by any of the witnesses, and that therefore it can be assumed that he answered correctly all of the questions asked him. To determine the matter solely upon that basis, however, would be inconsistent, or in conflict with, the testimony of the defendant, Jack Bellah, himself, who, in speaking of Prater, on cross examination, stated: "He needs a guardian." He further testified: " * * * it is all right for him to have a guardian; I think he should be able to appoint who he wants." Other portions of his testimony, and of the

testimony of other witnesses, impel the conclusion that said defendant's position in the present case is more the result of his and Prater's ill feeling toward the present guardian, Cooke, than to any categorical conviction that Prater is wholly competent to handle his own affairs without a guardian. If Prater was incompetent at the time of the trial in July, 1958, and there is evidence of his incompetency before that, and prior to his execution of the subject deed in February of the same year, then this would reasonably tend to overcome any legal presumption, that might otherwise exist, of his competency when executing the deed. Pertinent to his condition before February, 1958, Dr. J, who, while he had not attended Prater for approximately 13 months previous to that time, testified that during the period he treated him, Prater, in addition to his other ailments and/or infirmities, was suffering from "* * * arteriosclerosis; in a senile condition" and "* * * it won't improve; it probably over a period of time, progressively gets worse." On the basis of his findings and conclusions as to the effect of such a condition in a man of Prater's advanced age, Dr. J expressed his opinion that Prater would not have been competent on February 3, 1958, to make a transaction like the one in question. Other witnesses testified, without contradiction, and in rather minute detail, concerning Prater's conduct while making repeated attempts to pay taxes in various court house offices, when none (with which any of those offices had any connection) were due. In view of Prater's previous experience and business acumen, such conduct, as described by those apparently disinterested witnesses, was definitely not normal for him, and, in our opinion, was evidence of at least a confused mental condition. Without discussing the evidence in any further detail, we think it obvious that the trial court's judgment cannot be said to be against the clear weight of the evidence.

In view of the trial court's better position to competently weigh the evidence, we cannot say that the judgment herein appealed from was against the clear weight thereof. It is therefore affirmed.

DAVISON, C. J., WILLIAMS, V. C. J., and WELCH, JOHNSON, JACKSON, IRWIN and BERRY, JJ., concur.