Sibyl Gee **ALEXANDER**, Emmett L. Gee, and Amanda E. Gee, Individually, and as Administratrix of the Estate of Magnolia Gee, Deceased, Plaintiffs in Error,

v.

Grace C. **GEE**, a widow; Edwin S. Gee and Bernice Gee, husband and wife; and Erwin Jefferson Gee and Pauline Gee, husband and wife, Defendants in Error.

No. 38660.

Supreme Court of Oklahoma.

May 10, 1960.

Rehearing Denied June 7, 1960.

O. J. Roberts, Oklahoma City, W. Custer Service, Edmond, for plaintiffs in error.

Simons, Mitchell, Headrick & Mitchell, by Earl B. Mitchell, Jr., Enid, for defendants in error.

BLACKBIRD, Justice.

Emmett Gee and Sibyl Alexander, a son and daughter of Rachel Gee, deceased, commenced this action in November, 1954, to quiet their alleged title to certain undivided interests in a 160-acre Major County farm, and to cancel, as invalid and without consideration, certain deeds purporting to convey it and/or interests in it. The farm had belonged to the mother, Rachel Gee, whose death, intestate, occurred at Edmond, in 1927. By final decree entered in 1928, in the administration proceedings covering it, the estate, consisting of said farm and the family home on East Main Street in Edmond, was determined to have been inherited in undivided ⅙th interests by the plaintiffs herein and their then living brothers and sisters, Frank, Thomas, Amanda and Magnolia Gee. At least partly because Magnolia, who had been its administratrix, had an unsatisfied claim against the Rachel Gee Estate of more that $1400 (she had expended of her own funds in the administration) no effort was made to disburse the estate as prescribed in the final decree for several years thereafter, except that Emmett received his interest which he thereafter mortgaged to an Enid bank. During this period, Magnolia appears to have been managing the estate, with the advice of Frank, who was a lawyer.

In 1930, an arrangement was formulated, which apparently had for one of its purposes the estate's eventual partition. This plan was outlined in a "Memoranda Of Agreement", dated August 13, 1930, ostensibly joined in by Frank, Amanda, Magnolia and Sibyl, recognizing that Emmett had received his share; representing that Frank had been settled with, and had assigned his share to other heirs; and, providing for exchanges of deeds whereby title to the Edmond home would be vested solely in Amanda and Sibyl, and the farm would be held by Magnolia, jointly for herself, Thomas and Sibyl. The so-called "Agreement" provided for the preservation of Magnolia's aforesaid claim, as a lien against the estate property until it was paid or released; and it contemplated that Magnolia, Thomas and Sibyl might make out-of-court adjustments of their interests between themselves.

The first conveyance plaintiffs sought, in the present action, to have cancelled, was a quit claim deed dated February 24, 1937, and introduced in evidence as their Exhibit "B", purporting to place title in Magnolia to the other undistributed interests in the farm. The second was a quit claim deed dated February 8, 1940, introduced as plaintiffs' Exhibit "C", purporting to transfer the interests of Frank, Amanda and Magnolia to Sibyl. The third sought to be cancelled was a quit claim deed, dated December 6, 1940, introduced in evidence as plaintiffs' Exhibit "E", purporting to transfer Sibyl's interest to Magnolia. Other deeds figuring in the controversy and introduced in evidence as defendants' Exhibits 1 to 3, inclusive, were those by which Emmett's interest, that had nearly been lost by the Enid bank's foreclosure of its mortgage, was transferred by its purchaser at the foreclosure sale to Magnolia, after she, Amanda and Frank had contributed the money to satisfy the bank's mortgage indebtedness against it, together with the costs of the foreclosure action.

The remaining conveyances plaintiffs sought to have cancelled were two of the three deeds introduced in evidence as plaintiffs' Exhibits F, G, and H, respectively, that Magnolia executed in June, before her death in December, 1952, and, by means of which, she purportedly transferred the farm in varying interests to her four living brothers and sisters and to the aforenamed widow and sons of her brother, Thomas, who had died several years previously.

One of these three conveyances, Exhibit F, was a warranty deed purporting to convey the surface rights in 120 acres of the Rachel Gee Farm to Thomas Gee's widow, Mrs. Grace C. Gee, "as trustee for her bodily heirs." It was delivered and recorded about the time of Magnolia's death. The other two deeds were found among said grantor's personal effects, after her death. One of them, Exhibit G, was a warranty deed purporting to convey the southwest 40 acres of the farm to Amanda. It has never been recorded. The other, Exhibit H, was a mineral deed purporting, among other things, to convey to all four of the living sisters and brothers, and Thomas' widow, Grace, the mineral rights under five respective 32-acre portions of the farm. Amanda had this deed recorded soon after Magnolia's death; and plaintiffs did not seek its cancellation.

At the trial, which commenced in January, 1959, Frank Gee, the attorney-heir, did not appear. According to Sibyl's and Amanda's undisputed testimony, they acquired the Rachel Gee home at Edmond in 1946, and have resided there ever since. No attempt was made to show that any part of the plaintiff, Emmett Gee's, inherited ⅙th interest in the Rachel Gee Farm, involved in the above-mentioned foreclosure, had ever been restored to him, other than the substitute interest set forth in Magnolia's above-described mineral deed, plaintiffs' Exhibit "H".

When interrogated, as a witness, about the reason for her having had that deed recorded, Amanda testified she did so because she "thought it was a fair distribution; there was no objection to it"; and she disclosed that she had, in December, 1958, executed and delivered an oil and gas

lease on her interest to Champlin Oil & Refining Company. Sibyl testified that when, after Magnolia's death, she and the other Rachel Gee heirs "looked over her deeds * * *" and found *that* one (plaintiffs' Exhibit "H"), they thought that recording it was "the proper thing to do, * * *". Amanda adopted the opposite attitude with reference to plaintiffs' Exhibit "G", however, and testified she was not claiming any interest under it, and did not have it recorded, because she didn't think it was a fair or valid deed. Both Amanda's and Sibyl's testimony was contemplated to show, among other things, that the deeds to Magnolia of the heirs' interests in the Rachel Gee Farm, were executed without consideration, and merely to enable Magnolia in the farm's management as a unit for all of the heirs, to comply with certain federal regulations supposedly having to do with government agricultural programs.

In rendering judgment for defendants denying plaintiffs the relief they prayed for, the trial court indicated, by his oral remarks from the bench, that he regarded, as significant, the fact that all of the deeds comprising Magnolia's chain of title to the Rachel Gee Farm, and particularly those introduced as plaintiffs' Exhibit B, and defendants' Exhibits 1 to 3, both inclusive (supra), were filed of record on the same day—which was March 27, 1942—and that, in his opinion, this was one circum-. stance creating grave doubt that said Exhibit B, executed more than five years previously in 1937, was *just* to enable her to execute contracts with the U. S. Government, or its Department of Agriculture. In his judgment, the trial court specifically found that the hereinbefore described mineral deed, and two warranty deeds, Magnolia executed in June, 1952, a few months before her death, were valid conveyances of the interests therein described; and quieted the title to the Rachel Gee Farm, accordingly, thus confirming the grants therein described.

After the overruling of separate motions for a new trial, filed on behalf of plaintiffs

and Amanda Gee, both as an individual and as administratrix of Magnolia Gee's estate, said movants, hereinafter referred to as appellants, perfected the present appeal. Their adversaries, the hereinbefore mentioned widow and two sons of Thomas Gee, and their wives, will hereinafter be referred to as appellees.

■ Under their Propositions I and II, appellants contend, on the basis of what they say is "uncontradicted and not inherently improbable evidence" that no beneficial interest of any of the Rachel Gee heirs was conveyed, or was to be enjoyed, with the legal title transferred by the hereinbefore mentioned deeds (Plaintiffs' Exhibits B, C, and E) and that said instruments were merely trust deeds creating a resulting trust, by which the grantees therein named held the legal title in trust for the real owners, who were Amanda, Emmett and Magnolia Gee, and Sibyl Alexander. They say "there can be no conclusion", but that, by the conveyances to her, Magnolia held the title thereby transferred, not just for herself, but also for the other three aforesaid Rachel Gee heirs. Appellants recognize that the burden rests upon parties claiming the creation and existence of a trust, to prove it by "clear and convincing evidence", but they quote extensively from the hereinbefore mentioned testimony of Sibyl Alexander and Amanda Gee, and characterize it as such that the trial court could not, under the rules in effect in this jurisdiction, disregard it and render judgment (as he did) contrary to it.

We do not think that proper application of the rule appellants contend for (see Taggart v. Snipes, 174 Okl. 449, 50 P.2d 640) reveals error in the trial court's judgment. He, apparently, was of the opinion, after considering Amanda's and Sibyl's testimony with other evidence in the case, that the conveyances placing title to the Rachel Gee Farm in Magnolia Gee were drafted, executed and delivered in accord with a tacit, if not express, agreement by the heirs generally, of the sort evidenced by the hereinbefore described "Memoranda Of Agreement" (Plaintiffs' Exhibit D). While

it is true that specific features of the original plan of vesting title, outlined in this document, were changed, or departed from, through the years of its "supervision" by Magnolia and the attorney brother, Frank, due to financial exigencies and various changes in the fortune of those involved, yet the general scheme of equitable distribution, without court partition proceedings, of which this agreement was at least a beginning, is shown to have been carried out to a greater or lesser extent. Though Amanda and Sibyl admitted executing the 1937 deed, they denied that their purported signatures on the Memoranda copy were genuine, or that they agreed to the plan therein outlined, and testified, to the effect that the deed was executed and delivered to Magnolia to enable her to more conveniently and effectively manage the farm for the other heirs. There were circumstances occurring during the years after the date of the Memoranda, however, that render such testimony of doubtful accuracy. Furthermore, when Amanda was asked on re-direct examination, if she had ever seen said Memoranda before, she replied:

"Well yes, I think I did, and I think

I wanted it—well I think I made a quite a bit of,—well I didn't like it."

Though this rather puzzling answer was followed by Amanda's rather incongruous denial (in answer to a leading question by her attorney) that she saw the instrument before it was filed or knew what was in it, we are convinced that she at least acquiesced in it, and that she and the heirs generally have benefited from it as administered and executed by Magnolia, who appears to have had the ability and cash resources to do so, at times when the other heirs did not.

Amanda and Sibyl make no complaint about two of the estate's parts—the Edmond home and the 32-acre mineral interests—they received through Magnolia. In plaintiffs' evidence concerning Amanda's and Sibyl's acquisition of the Mother's home, it is referred to as having been "purchased" by them; and Amanda mentioned the execution of notes for its purchase price; but it was never established what amount of these sisters' funds, if any, went into payment of the notes. In a rather vague and uncertain way, Amanda testified that Magnolia looked after paying off the notes, and that this was done out of income from the farm (or at least the witness' portion of it) but the witness also admitted receiving many checks from Magnolia during the years she was trying to hold the estate together, and her testimony, as to the purposes of these payments to her, and the sources from which they were derived, was unsatisfactory, contradictory, equivocal and unconvincing.

We think it significant that plaintiffs neither offered, or introduced, any positive proof that Amanda and Sibyl had received any part of the agricultural income from the farm, since their indebtedness for the Edmond home was liquidated, except the crop rent the late Thomas Gee's son, Erwin (who has farmed the whole 160 acres since 1935) has paid Amanda since 1952, on the 40 acres Magnolia deeded to her that year. Though, as hereinbefore noted, Amanda testified that she had not recorded the deed referred to, because she didn't think it was a fair or valid deed, she has received her 40-acre proportionate part of this rental, without complaint to Erwin that she was entitled to a larger part of it, and without objection to his or his Mother's paying the installments coming due on the farm loan indebtedness to the School Land Commission during this period as well as the taxes on the 120-acre portion of the farm Magnolia deeded, as aforesaid, to the widowed mother, Grace "and her bodily heirs."

Also, in connection with their contention that there was no consideration, or mutual agreement, connected with Amanda's and Sibyl's inherited interests in the farm being replaced by the specific property Magnolia deeded them, plaintiffs ignore the latter's payment of a debt of more than $800, with which Amanda had encumbered a piece of her Edmond property, to obtain money for

# 920

Frank to apply on expenses in the Enid bank litigation, hereinbefore mentioned.

On the basis of the evidence, and without any evidence from Frank or Magnolia Gee, both of whom would have been in a better position to establish the true facts of this case than any of the witnesses who testified, we are not prepared to say that plaintiffs discharged their burden of proving that the deeds, they complain about, created a resulting trust or trusts, or were trust deeds, rather than conveyances of both equitable and legal title, as they purported to be. In this connection, notice our description in Gaines v. Gaines, 207 Okl. 619, 251 P.2d 1044, 1047, of the double burden which confronts plaintiffs in cases of this character. In the very recent case of Lincoln v. Wells, Okl., 350 P.2d 589, we demonstrated that courts are not bound by interested litigants' uncontradicted testimony, which, despite its abundance, does not induce belief under all of the facts and circumstances. There, we also discussed, and demonstrated, the reluctance of the appellate courts to countermand the trial court's appraisal of such evidence, in a case where one of the parties to the deed involved was dead, and the person, who drafted it, did not testify. The opinion of the trial judge, who saw the witnesses and observed their demeanor while testifying, is entitled to great weight. Harrell v. Nash, 192 Okl. 95, 133 P.2d 748, 754. The principles applied to these considerations in those cases also apply here. After carefully examining the record, and applying to the case the legal principles properly applicable to it, we cannot say that the trial court's judgment is clearly against the weight of the evidence. It is therefore affirmed.

DAVISON, C. J., and WELCH, HALLEY, JOHNSON, JACKSON, IRWIN and BERRY, JJ., concur.

WILLIAMS, V. C. J., dissents.