**ALLIED RESERVE LIFE INSURANCE COMPANY, a Corporation, Plaintiff in Error,**

v.

**Dorothy PIERSON, as Administratrix with Will Annexed of the Estate of Alta H. Chilton, Deceased, Defendant in Error.**

No. 38843.

Supreme Court of Oklahoma.

Nov. 15, 1960.

Abernathy & Baker, Charles C. Baker, Shawnee, for plaintiff in error.

Bryan Billings, Woodward, for defendant in error.

BLACKBIRD, Justice.

This appeal involves an action to enforce, and/or recover upon, two insurance policies issued to the late Alta H. Chilton of Woodward, Oklahoma, by Reserve Life Insurance Company of Dallas, Texas. One of the policies is denominated a "Hospital And Surgical Expense" policy—the other is a "Hospital Room" policy.

Miss Chilton's separate applications for these two policies were obtained for said insuring company by one J. H. Pewitt, one of its "itinerant" agents, in March, 1955, when Miss Chilton, a former insurance agent herself, was 65 or 66 years of age and had suffered from, and been treated in the McBride Clinic at Oklahoma City for, chronic arthritis over a period of more than 15 years.

The blanks for answer to the questions appearing on the printed application forms (designed for use either by individuals or family groups) were written, or filled, in by Pewitt's handwriting, though Miss Chilton's signature appears on the line provided therefor at the bottom thereof. The form's questions numbered "6", "8", and "9", together with their handwritten answers, are in words and figures substantially as follows:

"6. Are you and all other members of the Family Group to be insured now in good health and free from any physical or mental defect?....Yes.....

"8. Have you, or any member of the Family Group to be insured ever had any disease of the heart, lungs, kidneys, stomach, or bladder; or high blood pressure, paralysis, arthritis, syphilis, cancer, diabetes, hernia, goitre, or rectal disease?....No........
\* \* \* \* \* \*

"9. Have you, or any member of the Family Group to be insured, received medical or surgical advice or treatment within the past three years?........No..... A. H. C."

Across that part of the applications in which questions "8" and "9" appear, a diagonal line was drawn, and Miss Chilton's initials were written, in ink in substantially the same positions as depicted above.

Subsequently, in June, 1956, Allied Reserve Life Insurance Company of Oklahoma City, plaintiff in error herein, assumed the position of insurer in Miss Chilton's policies (together with others

issued to Oklahoma residents by the aforenamed original insurer) and issued to her on each policy an "Assumption Certificate" in which it promised, in substance, to carry out all of the provisions of said policies, if the insured complied with her obligations thereunder and continued payment of the premiums.

In July, 1957, Miss Chilton was again hospitalized for her arthritis, and plaintiff in error paid a claim for hospital expenses she forwarded to it. In connection with said claim, said company was furnished with a medical report denominating the illness for which she was hospitalized as "chronic arthritis", and reflecting the fact of its long existence.

In August of the same year, Miss Chilton was again hospitalized—this time in a Woodward hospital—at the direction of her physician, a Dr. D, who examined her on a call to her residence, August 11, 1957, and diagnosed her as having "chronic myocarditis with decomposition" or "cardiac decomposition", in addition to her other ailments. After her period of hospitalization, which began 3 days later, or August 14th, terminated the following October, Miss Chilton was removed to a Woodward rest home. By this time, a claim for part of Miss Chilton's expenses in connection with this hospitalization had been made on her behalf, against plaintiff in error, which had rejected it and refused payment, and started an investigation of her health history and medical records.

Toward, or after, the end of this investigation, plaintiff in error engaged Retail Credit Company, through its Claim Director, Ross Wood, of Oklahoma City, to contact Miss Chilton for the obvious purpose of settling said claim. Pursuant to said employment, Wood went to Woodward on December 28, 1957, visited Miss Chilton in her room at the rest home, and in consideration for his delivery to her of a draft on plaintiff in error for $129.10 refunding premiums Miss Chilton had paid on the subject policy (since satisfaction of her previous smaller claim) obtained her ex-

ecution of a general release of all claims thereunder. The draft was paid on Miss Chilton's endorsement four days later, and 8 days thereafter, on January 9, 1958, County Court proceedings were instituted by Mrs. Dorothy Pierson, for the appointment of a guardian for Miss Chilton. In said proceedings, Miss Chilton was declared legally incompetent by order of court entered January 15, 1958, and, by the same order, Mrs. Pierson was appointed guardian of said incompetent's person and estate.

The present action was thereafter instituted in June, 1958, by Mrs. Pierson, as guardian, on Miss Chilton's behalf, against plaintiff in error, as defendant, to compel payment of the claim said defendant had theretofore rejected, as aforesaid. Before the cause was at issue, Miss Chilton died in September, 1958; Mrs. Pierson was thereafter appointed administratrix of her estate; and this cause was then revived in her name as such. In this capacity, she will hereinafter be referred to as plaintiff, and Allied Reserve Insurance Company will be referred to as defendant, as they appeared in the trial court.

By an amended petition thereafter filed, plaintiff alleged some of the material facts already herein related, and sought judgment in the total sum of $523 as that part of the deceased Miss Chilton's medical, hospital, and ambulance expenses, which defendant was allegedly obligated to pay under the terms of the subject policies.

In its answer, and the supplement and amendment thereto, defendant denied generally the allegations of plaintiff's petition not specifically admitted therein, and, in substance specifically alleged:

(1) That the ailments, on account of which the insured's medical and hospital expenses were incurred, were not such as resulted, under the policies' "insuring" provisions " * * * from sickness the cause of which *originates* while this policy is in force and effect and more than 15 days after the date hereof * * *";

(2) That defendant was not liable under the policies for the further reason that they were issued in reliance upon the representations, as to Miss Chilton's health and medical history, contained in the hereinbefore quoted portions of her applications for the policies, which representations were false; and

(3) That if any liability was ever incurred by reason of the issuance of said policies, it was terminated and obliterated by said insured's execution and delivery of the hereinbefore mentioned release. (Emphasis ours.)

In her reply, and the amendment thereto, plaintiff pointed out that the answers to the questions on the applications for the policies, (which defendant's answer characterized as "misrepresentations" on the part of Miss Chilton) were written by the insurer's agent, Pewitt, and alleged that defendant was estopped to deny they were false or incorrect. Plaintiff's reply further called attention to the line drawn through that portion of the applications, inferred that such representations were thereby stricken from said applications, and specifically denied that either the original insurer, or defendant, as its successor in the assumption of such risk, ever relied upon said alleged representations, or were in any manner thereby mislead to their prejudice. In the amendment to her reply, plaintiff admitted Miss Chilton's execution and delivery of the afore-described release and her receipt of the draft, and its proceeds, given her as a part of the same transaction, but alleged that said release was wholly ineffective as Miss Chilton was mentally incompetent at the time it was executed and delivered. In said reply amendment, plaintiff prayed for cancellation of said purported release, offered to return the proceeds of the described draft, and requested the court to establish said tendered amount of $129.10 as a set-off, or credit, against the recovery of $523 sought in her original petition.

Upon trial of the cause to the court, without a jury, judgment was entered for plaintiff in the sum of $402.90 with interest,

as prayed for, in accord with certain findings of fact and conclusions of law, which defendant now attacks in its present appeal from the judgment.

In its first argument for reversal, defendant challenges the sufficiency of the evidence to support the trial court's finding and conclusion as to the aforementioned release. The questioned finding of fact was, in substance, that when Miss Chilton executed the release and received, endorsed, and cashed defendant's draft returning to her premiums in the sum of $129.10, as aforesaid, she "was mentally incompetent to understand the nature and effect of same, or to transact her business affairs." Among his conclusions of law, the court determined that, by reason of Miss Chilton's said incompetency, her execution of the release, and the return to her of the premiums, "were null, void and of no force or effect to release or discharge said defendant from its liability under said policies."

■ In support of its argument, defendant reasons as follows: A release is a contract, and its avoidance is therefore governed by the same rules that govern the avoidance of other contracts; and since, in Oklahoma, the only persons who by statute are made incapable of contracting are those "entirely without understanding" (Tit. 15 O.S.1951 § 22), and those of unsound mind (in addition to two other classes of persons not material here) defined as "idiots, lunatics, and imbeciles" (15 O.S.1951, §§ 11, 16) the evidence did not sufficiently support the judgment because it did not establish that Miss Chilton was either of these kinds of persons, at the time she executed the release which the trial court's judgment purported to nullify. Such reasoning is fallacious because it ignores our statutes pertaining to the rescission and extinction of contracts. See Tit. 15 O.S.1951 § 23, and § 231 et seq. It fails to distinguish between a contract that is decreed by law to be prima facie void (because entered into by one of the types of persons incapable of contracting) and a contract that is not void, but may be avoided, or rescinded, in the manner provided by certain special statutes upon proof that it was entered into under certain circumstances described therein. In this connection, see Mock v. Stricklin, Okl., 315 P.2d 247, 251, 252, and the cases quoted therein. In the recent case of Bellah v. Cooke, Okl., 347 P.2d 794, we noted the recognition, in our statutes, of this distinction, making it unnecessary under sec. 23, supra, and other statutes therein referred to for a guardian, seeking cancellation of a deed, or recission of a contract, previously executed by his or her ward, to prove that, when the instrument was executed, the ward was entirely without understanding, as is required to be proved by section 22, supra.

■ Defendant next undertakes to show that plaintiff did not discharge her burden of proving, by clear and convincing evidence, that at the time Miss Chilton executed the release, she did not understand the nature of such act or its effect. Its counsel adverts to portions of plaintiff's evidence, particularly to the testimony of Miss Chilton's family physician, Dr. D, to the effect that "there were times" when Miss Chilton was competent. Counsel seems to be of the view that with plaintiff's evidence thus recognizing Miss Chilton's competency on some occasions, and with Ross Wood, the Claim Director, being the only witness, who observed her at the particular time she executed the release, testifying that she appeared to be competent on that occasion, the trial judge, on the basis of the evidence, was bound to have held that she was then competent, and that the release was valid. We do not agree. Ross Wood's testimony was not the only competent evidence as to Miss Chilton's mental condition on December 28, 1957, the date she executed the release. Evidence of her mental condition both *before and after* the release's execution was also competent. Bellah v. Cooke, supra. Dr. D, who attended Miss Chilton both before and after the date of its execution, testified positively that Miss Chilton was not capable of understanding what a release was on October 4, 1957, when she went from the hospital to the rest home

as aforesaid; that she was then "pretty well (mentally) disturbed"; and that he doubted that she was capable of any (business) transaction in December of that year. The Doctor's testimony was also that Miss Chilton's condition grew progressively worse. Although plaintiff's testimony corroborated the Doctor's, and also indicated that, instead of signing a release, Miss Chilton thought she had given a deed of her property to the rest home, the trial judge's oral remarks from the bench at the time he rendered judgment, plainly show that because Claim Director Wood was an interested witness and was not a medical expert, his testimony was not given as much weight as that of Dr. D. It was said judge's prerogative to so appraise this testimony (see Alexander v. Gee, Okl., 352 P.2d 915, and Lincoln v. Wells, Okl., 350 P.2d 589); and his nullification of the release upon such appraisal does not render his findings, conclusions, or judgment lacking in the requisite evidentiary support. Because the trial judge's opportunity of determining whether or not the evidence was clear and convincing, as to Miss Chilton's ability or disability to execute a valid release on December 28, 1957, was superior to ours, we cannot say, on the basis of the record before us, that said determination was error. See the case quotations in White v. Morrow, 187 Okl. 72, 100 P.2d 872, at page 876.

■ Under its argument number "4", defendant contends in substance, that plaintiff did not make out a prima facie case in that she failed to discharge her burden of proof that the "sickness", for which Miss Chilton was hospitalized in 1957, as aforesaid, was one which (as required by the specific wording of the insuring clause therein) originated more than 15 days after said policies were issued (which date of issuance, as will be remembered, was in March, 1955). As to this phase of the case, the trial judge's finding of fact "(5)" was that the "cardiac decomposition" (for which Miss Chilton was hospitalized) first became manifest or active as a cause of hospital confinement on or about August 11, 1957; and, his con-clusion of law "(1)" was that said "sickness" originated while the policies were in force and more than 15 days after their issuance. Defendant contends in substance, that the trial court reached its stated finding and conclusion by applying the wrong test to the evidence. Its counsel says that, in determining whether or not Miss Chilton's heart condition originated more than the prescribed period after her policies were issued, the court—instead of finding when it "first becomes manifest or active as the cause of (her) hospital confinement * *" (for which test Reserve Life Insurance Co. v. Lyle, Okl., 288 P.2d 717, 718, 53 A.L.R. 2d 682, is cited as authority) should have appraised the evidence in terms of the more recent case of Richards v. American Security Life Insurance Co., Okl., 303 P.2d 1110, which holds:

"In an action on an insurance policy containing a provision providing indemnity for hospitalization 'resulting from sickness the cause of which originates while this policy is in force', the sickness is deemed to 'originate' *when it first becomes manifest by a symptom or condition from which one learned in medicine could with reasonable accuracy diagnose the specific disease which thereafter was the cause of the hospital confinement.*" (Emphasis ours.)

It is unnecessary for us to express any opinion as to the applicability to the present case of either of the above quoted definitions of the word "originate", to the exclusion of another. Assuming, without deciding, that the trial court employed the wrong theory, test, or finding in reaching his conclusion as to when Miss Chilton's chronic myocarditis, and/or cardiac decomposition, originated, if there was sufficient evidence, when gauged by all tests, to support a conclusion that said "sickness" originated more than 15 days after the policies were issued, the judgment will not be reversed on account of said finding. See Duncan v. Golden, Okl., 316 P.2d 1116; Mahan v. Dunkleman, 205 Okl. 54, 234 P.2d 366, 370, and

Douglas v. Douglas, 176 Okl. 378, 56 P.2d 362. In the recent case of Allied Reserve Life Ins. Co. v. Cunningham, Okl., 355 P. 2d 564, 565, it was held:

"2. A clause in an insurance policy providing for payment of expenses resulting from sickness, the cause of which originated while the policy was in force and more than fifteen days after issuance, will be strictly construed against the insurer, and the cause of the illness originates when it becomes active or manifests itself or when one learned in medicine can, with reasonable accuracy, diagnose the illness *As serious enough for treatment, and not at an earlier date when the medical cause might or may have had its origin.*" (Emphasis ours.)

We also therein held that evidence of the insured's having suffered no ill effects from the sickness or disability (in connection with which he sought recovery) until after the time provided in the policy for recovery, is sufficient for submission to the trier of facts, of the question of whether the disability was covered by the policy. In determining whether the trial court in this case committed error in the respects complained of, we have examined the record in the light of all of the above-quoted pronouncements. In doing so, we have included not only the testimony of Dr. D (described and quoted in some detail in defendant's briefs) but also other evidence pertinent to the matter.

As defense counsel points out, Dr. D testified, in substance, that although Miss Chilton had been his patient off and on for many years, during which time she suffered from rheumatoid arthritis or arthritis deformans, which is a progressive disease which "probably" comes on in younger life, he did not see her professionally between November, 1949, and May, 1956, but he denied that her cardiac decomposition could have developed at any time between those dates, without his knowledge. He also testified, however, that she had edema, or swelling of the feet, prior to October, 1956, and he noted on hospital records that she was suffering from enlarged heart and had a systolic heart murmur in July, 1957. This doctor further testified that "cardiac decompensation" is the same as cardiac, or heart, failure—that "* * * it refers essentially to the inability of the heart to maintain circulation, for any of a number of reasons"; that in addition to the named conditions, Miss Chilton had high blood pressure and shortness of breath. The witness further testified that he didn't remember whether he had diagnosed Miss Chilton's heart ailment prior to August 11, 1957, or not, because he didn't bring his older clinic records to court with him; but he stated that, to the best of his knowledge, said date was when he first discovered that the patient's heart was involved and it was the occasion of his first diagnosis of heart condition. Dr. D also testified that "myocarditis" means "* * * some inflammatory or degenerative process of the myocardia, or the heart muscles", and he admitted that "chronic" means: "of long standing", but he explained that his use of this word was intended to mean only that the patient had had some "heart damage" from her arthritic condition "a considerable period of time, but not the decompensating factor." He further testified:

"You don't find an old chronic arthritic, rheumatoid arthritis of that long duration, without some heart damage. Certainly she had had some heart damage, but it did not become particularly evident, or manifest, until about this stage of the game."

During Dr. D's cross examination and re-direct examination, portions of the deposition he had previously given on July 19th, 1958, were read and he was interrogated concerning them. Among those portions he reaffirmed on the witness stand, were the following:

"Question: Was the cardiac decompensation due to this gradual progress of this arthritic condition? An-

swer: I think I would have to say no on that.

\* \* \* \* \* \*

"Question: What do you think caused the cardiac decompensation? Answer: I think that this probably is the basis for an original rheumatic condition of the heart and probably the arthritis and the cardiac trouble had a common source rather than one being the cause of the other.

\* \* \* \* \* \*

"Question: She did not have a heart involvement back as long as the first time you saw her in 1948? Answer: That would be entirely speculative. It was never diagnosed and she never had any difficulty, but we see these old cardiacs coming up with decompensation and we know within reason that they had previous damage years before. Question: Can you suggest how many years? Answer: No.

\* \* \* \* \* \*

"Question: Is it your opinion that it extended at least as long as when you first saw her? Answer: Probably there was a basis for cardiac difficulty there at the time the arthritis first showed."

On the witness stand, Dr. D declined to say, however, that Miss Chilton's arthritis and cardiac decomposition "came along concurrent, at the same time, or that one caused the other—he merely stated: " \* \* \* you see, I wasn't there." Dr. D further testified as follows:

"(Question): Regardless of when this heart condition, cardiac decompensation had its medical origin, is it true, or just state whether or not it first manifested itself as a cause for hospital confinement on August the 11th, 1957?

\* \* \* \* \* \*

"(Answer): Yes, I think so and I think my answer would be yes, that is the first time we had been able to detect it to that extent.

"(Question): Then is it your testimony that the cardiac decompensation first manifested itself as the cause of hospital confinement, on or about August 11th, 1957?

"(Answer): That was the first time we felt like it was severe enough that she should be hospitalized."

On re-cross examination, the Doctor testified that he could not state "with reasonable medical certainty" when Miss Chilton's heart condition originated, and he also said he was unable to fix or name the date when one learned in medicine could, with reasonable accuracy, have done so. However, there are other parts of the record that are more significant in determining whether or not, on the basis of Miss Chilton's "symptoms" and/or edema, enlarged heart, high blood pressure, etc., persons learned in medicine could, with reasonable accuracy, have diagnosed her case as being one of myocarditis and/or cardiac decomposition before the date referred to in the "insuring" provisions of her policies. Records and correspondence from the afore-named Oklahoma City clinic, introduced in evidence, reveal that at least as early as May, 1952, Miss Chilton had some of these characteristics, particularly edema; and, on the 15th day of that month, one of the doctors of said clinic wrote her: "The swollen ankle is probably the result of a lowered protein." As early as June, 1939, one of said clinic's doctors wrote into that part of his report of a physical examination of the patient, pertaining to her heart: "There is a cystolic murmur heard over the apex, which cannot be heard in the axilla. The murmur is soft and blowing and heard throughout the entire cystole. The 2nd aortic sound is clearly accellerated and can be heard over the entire right chest." In February, 1954, one of said clinic's doctors wrote the Vocational Rehabilitation Division concerning Miss Chilton: "(She) Has been having some palpitation which may be the result of Liafon. \* \* \* She has a blood pressure of 220/110 which probably accounts for her palpitation." Despite the above,

and the comprehensive revelations in numerous physical examinations Miss Chilton had, extending over almost the entire period from 1939 to beyond the date of the issuance of the subject policies—the reports of which are all incorporated in the casemade—there is no mention, nor diagnosis, of myocarditis and/or cardiac decomposition, or evidence of any treatment, or hospitalization for that malady, until many months after said date. We think the evidence sufficiently shows that, under either of the above-quoted pronouncements of this court, the "sickness" for which Miss Chilton was hospitalized, for the period involved in this action, did not manifest itself until long after the 15 days designated in the policies sued upon. Therefore, there is no merit to defendant's contention that, because the evidence did not establish this element of plaintiff's case, the trial court erred in overruling its motion for judgment, and rendering judgment for plaintiff.

Defendant's proposition "3" concerns its defense that hereinbefore quoted answers to the questions on the insured's applications for the policies were false, and misrepresentations. As hereinbefore indicated, plaintiff not only did not deny that the answers to questions "8" and "9" were false, but at the trial stipulated that they were; and, in its finding of fact "(7)", the trial court specifically found that on March 24, 1955 (the date the applications for such policies were executed before J. H. Pewitt, agent of the original insuring company, Reserve Life, as aforesaid) " * * * and for many years prior thereto, Alta H. Chilton was afflicted with a disease known as rheumatoid arthritis, or arthritis deformans, and such fact was known to Alta H. Chilton." Pewitt did not appear as a witness in the case, but he figured prominently in the court's findings as follows:

"(8) That at the time J. H. Pewitt obtained the signature of Alta H. Chilton to said application she was so crippled and deformed by said disease that it was obvious to said J. H. Pewitt, or any other layman, that Alta H. Chilton

was then afflicted with arthritis and that she was not in good health; and that notwithstanding such knowledge, said J. H. Pewitt wrote the answer to the questions numbered 6, 8 and 9, in each of said applications.

"(9) That after writing said answers, J. H. Pewitt drew a line across the questions and answers numbered 8 and 9 in said applications and had Alta H. Chilton to initial the same with the intention of striking the same from said applications, but the Court further finds that regardless of the intentions of said J. H. Pewitt in drawing said lines, he knew that the answers to said questions were not true and was not misled in regard thereto."

In its findings of fact "(10)" and "(11)", the court further found that, in issuing the subject policies, Reserve Life Insurance Company did not rely upon the above-described answers appearing on Miss Chilton's applications; and that neither did the defendant company in assuming the obligations of the insurer thereunder.

 Despite their recognition that the burden was on defendant to prove that, in issuing the policies, it relied upon the above referred to representations of the applications therefor (Adams v. National Casualty Co., Okl., 307 P.2d 542) defense counsel's argument makes no direct reference to the above quoted findings, and contains no charge that they are inaccurate, or contrary to the evidence. Counsel merely take the position that the trial court was bound by the deposition of one of defendant's witnesses, a Gladys Anderson and the testimony of another named James Evans, to have determined that those representations were relied upon in the risk assumed originally by Reserve Life and thereafter transferred to defendant, citing Standifer v. Standifer, 192 Okl. 669, 138 P.2d 825, 827, for the rule that:

"When the evidence is uncontradicted, and not inherently improbable, either in itself, or when taken in connection with circumstances, the court is not at liberty to disregard it."

Defendant's argument cannot be upheld. We cannot say that the trial court should not have regarded, as interested witnesses, Gladys Anderson, who is Vice-President of Reserve Life, and Mr. Evans, who, at the time of the trial was Vice-President and Chief Underwriter of the defendant company, and was formerly employed, as early as 1955, in Reserve Life's underwriting department. Nor can their testimony, as to their company's reliance upon answers, which the trial court thought had been stricken from the applications, be held to be "uncontradicted", and "not inherently improbable", when considered in connection with other "circumstances", which latter term must include the drawing of the line through part of the applications and the initialing by Miss Chilton. To counteract the idea that this was intended to be, and was, a way of erasing, deleting, or striking those questions and answers from the applications, defendant elicited testimony from Mr. Evans to the effect that, under defendant company's procedure, or "policy", this was merely the means of having applicants for its insurance attest to "the answers that are entered" on its applications. The trial judge's oral statement from the bench at the time. he rendered his decision makes it crystal clear that he did not accept this explanation as verity. Without further lengthening this opinion to quote said court's reasons for concluding that such explanation was inherently improbable, or, as he put it, did not "stand to reason", it is sufficient to say that we are not in a position to disagree with him. Here, as in Lincoln v. Wells, and Alexander v. Gee, supra, the party who executed the questioned documents (applications) is dead, and the person who filled out the blanks therein and otherwise put them in the form in which they were accepted by defendant, did not testify. In our opinion, in the last-cited of these cases, it was noted that, in the first one, we demonstrated that courts are not bound by interested witnesses' testimony (not directly contradicted by other testimony) if it does not induce belief under all the facts and circumstances. In this connection, see also Taggart v. Snipes, 174 Okl. 449, 50 P.2d 640. Here, as we have in other cases where there is a conflict between the testimony and the reasonable, logical and plausible inferences drawn by the trier of facts from the facts and circumstances as a whole, we must recognize the superior position of that adjudicator in weighing the evidence, and also his or its measure of freedom in determining the testimony's credibility or incredibility. See Taggart v. Snipes, supra. After we have done this, and upon a careful examination of the record as a whole, we cannot say that defendant discharged its burden of proving its reliance upon the marked and initialed portions of the subject applications. Without proving this, defendant was not entitled to prevail; and the trial court did not err in refusing its motion for judgment. In view of the conclusions already announced, it is unnecessary to consider other arguments advanced concerning "waiver", "estoppel", etc.

In accord with the foregoing, the judgment of the trial court is hereby affirmed.

DAVISON, C. J., WILLIAMS, V. C. J., and HALLEY, JOHNSON, JACKSON, IRWIN and BERRY, JJ., concur.