**Shirley Lee GAMBLE, Plaintiff in Error,**

v.

**Don GAMBLE, Defendant in Error.**

**No. 43436.**

Supreme Court of Oklahoma.

July 21, 1970.

Rehearing Denied Dec. 8, 1970.

Turner & Gregg, Oklahoma City, for plaintiff in error.

Allen & Allen, by Walton Allen, Chickasha, for defendant in error.

BLACKBIRD, Justice.

The parties to this appeal appear here in reverse order to their appearances in the trial court, and will be referred to by their designations there of "plaintiff" and "defendant". The issues herein arose in an action in which their marriage was dissolved by divorce.

When plaintiff and defendant were married in the early fifties, both had children by previous marriages. After their marriage to each other, plaintiff adopted defendant's two children by her previous marriage, and two children were thereafter born of their marriage. In May, 1968, when the first of the various recorded hearings in this case occurred, said adopted children, Linda Sue and Paul, were seventeen and sixteen years of age, respectively, and the issue of this marriage, Michael and David, were eleven and three years of age, respectively.

Plaintiff filed one action to divorce defendant in 1962, but, after a separation of a few months, he and defendant resumed living together.

Before defendant became pregnant with the youngest son, David, about 1964, she began taking training in the grooming of poodle dogs at a dog kennel in Oklahoma City. After David was born, she resumed commuting from the couple's home in Chickasha to the Oklahoma City kennel, and did this several months before the couple purchased the kennel. Since this purchase, defendant has operated the kennel, while plaintiff has continued to operate the couple's insurance agency in Chickasha and to help with the kennel on weekends, spending nights at living quarters on the kennel premises when defendant was away attending dog shows.

In the spring of 1968, defendant filed an action for separate maintenance and support against plaintiff, but, after he instituted the present action against her for divorce on the ground of incompatibility, and amended his petition praying, additionally, for the exclusive custody of the children and all of the parties' property, defendant dismissed the separate maintenance suit and filed an answer and cross-petition in this divorce action.

In her answer and cross-petition, defendant also prayed for a divorce, alleging cruelty and gross neglect of duty by the

plaintiff, as well as incompatibility. She also alleged that on a date shortly before he filed the divorce action, plaintiff "bodily threw" her out of their Chickasha home, and took the youngest son, David, from her, telling her she would not see the child again until she deeded all of the parties' property over to plaintiff. She further alleged, in substance, that plaintiff was attempting to use possession of this child to bargain for the parties' jointly acquired property. She further alleged that plaintiff was forcibly keeping David from her and prayed that plaintiff be restrained and enjoined from interfering with said child and her care and custody of him.

Defendant further alleged that plaintiff had an income of more than $27,000.00 per year from his insurance business and real estate holdings; and, in addition to the divorce, she prayed for an equitable property division, alimony, custody of the children (all of whom, except David, she alleged were then living in her mother's home in Chickasha), child support, attorneys' fees, court costs, and temporary suit money.

Upon her application therefor, the court thereafter, on April 23, 1968, entered its order giving defendant the custody of the children, directing plaintiff to pay the school expenses of the older son, Paul (who was then attending Oklahoma Military Academy), until further order of the court, and restraining plaintiff from interfering wtih David and her care and custody of him, and from conveying, or otherwise disposing of, mortgaging, or encumbering any of the parties' jointly acquired property. In this order, plaintiff was also directed, among other things, to pay defendant $400.00 per month in support money, $500.00 for defendant's temporary attorneys' fees, and another $500.00 for these attorneys' benefit in conducting discovery proceedings.

On the same day (April 23rd), plaintiff filed a motion to modify the above described order, alleging, among other things, that he was willing to pay any amount of Paul's Military Academy expense, within his ability to do so, if he knew what it was; that defendant had removed and absconded with office equipment and records from his business, and he is unable to pay the sums required by the court's order; that the court's order restraining him from encumbering his property is unreasonable and oppressive because he cannot pay his current financial obligations without so doing; and that he should be able to retain the temporary custody of the child, David, because defendant abandoned him, and it would not serve the child's best interests to change his custody at this time.

Before any hearing on plaintiff's above described motion to modify, defendant, within less than a month after it was filed, consulted a psychiatrist, Dr. B, for the purpose, as expressed in said Doctor's letter-report, dated June 18th, to her attorney, of obtaining "a psychiatric evaluation and opinion regarding the potential mental health and welfare of David as it might be affected by continued contacts with his fatther." In said report, this Doctor related that, when defendant conferred with him about this matter, she described characteristics concerning plaintiff's association with David which appear calculated to indicate that his fondness for the boy was of an abnormal character; that plaintiff's conversion to a certain named religious faith had changed his personality; and that, in substance, his religious indoctrination had been used by plaintiff in talking to the child in a pitying, but disparaging, way, about defendant. As a result of two contacts with David, following his conference with defendant, the Doctor expressed the written opinion that, on the basis of the information referred to in this letter, the continuation of the relationship between plaintiff and David was "undesirable and a threat to the child's emotional well-being." The Doctor's letter closed by saying: "Under the above circumstances, one should consider the advisability of visitation privileges by the father *only in the presence of a third acceptable party.*" (Emphasis added)

When plaintiff's above described motion to modify was thereafter heard on July 3, 1968, neither defendant, nor her counsel, mentioned the contacts with the psychiatrist above referred to, and the court modified its previous order by directing plaintiff to pay $300.00 per month for support of his family, and to pay one-half ($200.00 per month) of the $400.00 monthly payment on the kennel's mortgage indebtedness. This order also authorized plaintiff to have David for visits every other weekend. When plaintiff thereafter, on July 7th, went to the dog kennel to pick up David for such a visit, an altercation occurred in the presence of Michael and Linda. Linda thereafter claimed that plaintiff injured her on that occasion, and, as a result, criminal charges of assault and battery, and a personal injury suit for $152,000.00 in damages, were filed against plaintiff.

Thereafter, in September, plaintiff applied for, and obtained, an order for defendant to appear in court on October 7, 1968, and show cause why she should not be punished for contempt for not complying with the above described July 3rd court order awarding him David's custody every other weekend. On the same day, defendant applied for, and obtained, a similar order for plaintiff to appear in court on the same day (October 7th) and show cause why he should not be punished for contempt for (among other things) not paying the sums of money he was directed, in the same previous order, to pay defendant for the support of the couple's children, to partially defray the monthly loan payments on the dog kennel, and to pay defendant's attorneys' fees and suit money.

Thereafter, at the October hearing on the contempt proceedings, one of the subjects, about which testimony was elicited, was the aforementioned July altercation that occurred when plaintiff drove from Chickasha to the Oklahoma City dog kennel to exercise the visitation rights with David, granted him by the court order a few days before. At this hearing, plaintiff's and defendant's versions of the incident differed; defendant testifying, in substance, that when plaintiff came to the kennel in his car to pick up the boy, she and plaintiff got into an argument over particular pieces of furniture that she was to be allowed to move to Oklahoma City from their Chickasha home. Defendant testified that when plaintiff denied her permission to have the furniture, in the presence of Michael and Linda, and she threatened to call her attorney, plaintiff pushed her against a desk in the kennel office, and that, when she asked Linda to call the police, plaintiff knocked Linda to the floor kicked her in the face, and broke her nose. Defendant further testified that she went to Linda's rescue, pushed plaintiff aside and sprayed him with some hair spray to keep him from kicking Linda again. She further stated that plaintiff then ran out to his car and sped away; that the police were called; Linda was rushed to the hospital; and the aforementioned criminal charges were thereafter filed against plaintiff.

Plaintiff testified that the couple's argument started when defendant refused to let him take David with him, without paying her the $500.00 he was ordered to pay under the court's order, a few days before, and that it was Linda who "held a vile of some sort right in my face and sprayed me", and it "burned like sixty".

Linda testified, for the first time, concerning a way, she termed "unusual", that plaintiff slept with David on the nights her mother was not at the family's Chickasha home and before the witness came to Oklahoma City to reside.

The afore-described letter of the psychiatrist, Dr. B, was also initially introduced in evidence at this October hearing. The hearing ended inconclusively, the court deciding that, in view of its being determined that plaintiff would convey his interest in one of the couple's unencumbered Chickasha properties to defendant so that sufficient funds could be obtained to satisfy the unpaid balances of child support, attorneys' fees, and suit money due her under the court's July 3rd order, and, in view of a date being settled upon for a trial of the

case on its merits, further consideration of plaintiff's visitation rights with David would await the trial, and defendant would be allowed to continue keeping David with her until that time.

The trial on the merits of the case commenced in December, 1968, and ended the latter part of January, 1969. Between these dates, the deposition of the aforementioned psychiatrist, Dr. B, was taken and subsequently introduced in evidence by the defendant. Also included in the evidence introduced at the trial was a report by a C.P.A., Mr. G (previously appointed by the court), which was introduced in evidence (pursuant to the parties' stipulation) as the "Court's Exhibit No. 1", purporting to set forth an itemized list of all of the couple's liabilities, with their dollar-evaluations appearing opposite their descriptions. Another writing, compiled by a court-appointed appraiser, Mr. M, and introduced as plaintiff's Exhibit No. 9, purported to list the couple's assets, with their respective dollar-evaluations.

At the close of the trial, the court took the case under advisement until the close of a later hearing, held March 4, 1969, to fix the amounts of the parties' respective attorneys' fees.

At the close of the latter hearing, the court entered its decree granting both parties a divorce on the ground of incompatibility, awarding defendant the care and custody of the minor children, and granting plaintiff visitation rights with the younger children, Michael and David, from noon on Saturdays until 6:00 p. m. on Sundays, two weekends per month, and full time during the month of August, and for five days during the Christmas holidays, each year. Also in the decree, plaintiff was ordered to pay defendant, as child support, the sum of $80.00 per month for each of the minor children until they reached majority, with the further provision that this amount would be only $100.00 in August when he had Michael and David.

By way of a property division between the parties, plaintiff was awarded the Chickasha insurance agency, with its furniture and fixtures, nine parcels of the couple's Chickasha realty, a boat and trailer, and the parties' Ford and Rambler automobiles, with the provision that plaintiff assume all indebtedness on said property.

By the decree, defendant was awarded the Oklahoma City dog kennel, with its furniture and equipment and all dogs owned in connection therewith, plus one parcel of Oklahoma County real estate, the remaining five parcels of the couple's Chickasha real estate, two house trailers, a 1966 Model Pontiac automobile, and all of the couple's furniture and furnishings located in Oklahoma City, with the provision that defendant assume all of the indebtedness on said property, except any debt plaintiff may have incurred on the smaller of the two house trailers.

In some of the other provisions of the decree, a judgment of $1,012.34 was awarded The Liberty National Bank and Trust Company of Oklahoma City, on account of unpaid purchases defendant had made on a credit card said Bank had mailed plaintiff; but, as a part of the property division, plaintiff was ordered to pay said judgment, as well as a debt of $432.54 incurred by the couple's son, Paul, in attending Oklahoma Military Academy, and fees of $200.00 and $425.00 to the court's aforementioned appointees, M and G, respectively, and attorneys' fees of $1,500.00 each to plaintiff's and defendant's respective attorneys.

After the overruling of the motion for a new trial, defendant filed the same day the divorce decree was rendered, she lodged the present appeal.

■ Under the first "PROPOSITION" in her initial brief, defendant contends that the decree's provision allowing plaintiff "unsupervised" visitation with the couple's minor child, David, is contrary to the weight of the evidence and constitutes an abuse of the court's discretion. Taking the position that some of plaintiff's past conduct shows his disregard for court orders, his inclination to "poison" David's mind

against her, and to do things detrimental to this boy's mental and moral welfare (contrary to previous decisions of this court), defendant quotes certain excerpts from the record of various court hearings in this case to support her position. In one of these excerpts, taken from plaintiff's testimony at the May, 1968, hearing, he admitted that, on one occasion, he changed baby-sitters for David explaining that he didn't want defendant to know where the boy was. In another, he admitted that he had David baptized without informing defendant of his intention to do so in advance. In others, he admitted that he had told the boy that his mother was possessed of the devil, who made her do what she did; and that the two (father and son) prayed for her to be given Divine help. Defense counsel also points to other testimony concerning plaintiff's attitude toward David, which counsel terms an "abnormal fixation", including the adopted daughter Linda's above mentioned testimony about plaintiff sleeping with David.

▬ This Court has followed the rule, applied in Bradford v. Bradford, Okl., 327 P.2d 684, that *only in exceptional cases* should a parent be denied the right to visit his or her minor child, or children, where custody is awarded to the other parent. And in In Re McMenamin, Okl., 310 P.2d 381, we held that the natural right of a divorced parent to visit his child, where the child's custody is awarded to the other parent, should not be taken from him unless the evidence *conclusively* shows that, by his conduct, he has forfeited his right of access to the child. Before this Court disturbs a trial court's ruling awarding a father, who has cared for his son, as the evidence tends to show plaintiff has cared for David, unsupervised visits with a son of David's age, it should also clearly appear, by convincing evidence, that the trial court has abused his discretion. In view of the strained relations between plaintiff and his adopted daughter, Linda, and her very human basis for revenge against him, after his hereinbefore described injury of her, for her to testify concerning plaintiff's

sleeping with David, in such a way as to make his conduct appear questionable, or abnormal, would be understandable, as would a tendency on the part of the trial judge to consider her testimony as coming from an "interested" witness. As to the testimony of "interested" witnesses, see Alexander v. Gee, Okl., 352 P.2d 915. Also, we know, as a matter of rather common knowledge, that very often young children, because of so-called "bad dreams", fear of the dark, or a feeling of insecurity, want to sleep with a parent; and the easiest way to keep them from being thus troubled is to let them do it. We have little doubt, considering his parents' marital situation, that young David had some basis for such a feeling of insecurity. Insofar as the evidence shows, defendant was not concerned with any claimed "unnatural" relationship between plaintiff and David, until she and plaintiff had become deeply embroiled in the present litigation, and plaintiff had sought court aid in depriving her of the boy's custody. From observation, we know the truth of the remark the trial judge made from the bench at the hearing November 25, 1968, on plaintiff's citation for contempt, as follows:

> "The Court is also aware—I run into it all the time in these divorce cases—each parent likes to use the children to get back at their husband or wife. In other words, if everything else fails, they will go to that angle. * * *"

By plaintiff's own admission, he and David "love each other a little more than ordinary." But in view of plaintiff's testimony that the boy was "quite sick" when he was a baby, three or four weeks old, and the evidence tending to show the necessity of plaintiff's acting as both father and mother to the boy, during defendant's absences from the home, we do not think it clearly appears that plaintiff's relationship with David is an unnatural one. Knowing of this affection, and with defendant's demonstrated ingenuity in attempting to discredit, and gain advantage over, plaintiff in the parties' bitter struggle, it is conceivable that she would try to prove that the father's and

son's relationship was an abnormal one, in the hope of restricting the father's association, and influence, with this son. Without detailing all of the evidence, and arguments, defendant relies upon to support her position, we think it is sufficient to say that we have thoroughly examined the record and are unable to hold that the trial court's ruling as to plaintiff's visitation privileges with David is contrary to the weight of the evidence, or constitutes an abuse of said court's discretion. That portion of the divorce decree granting plaintiff such privileges is therefore affirmed.

Defendant's "PROPOSITION II" is: "THE TRIAL COURT ERRED IN ITS AWARD OF SUPPORT PAYMENTS BASED ON THE EVIDENCE ADDUCED AT TRIAL." In her argument under this proposition, defendant intermingles various statements concerning plaintiff's failure to comply with various temporary orders the court made pendente lite and "until further order of the court", directing plaintiff to make the various payments for his family's support, suit money, and for other purposes. She recognizes no distinction between such sums—or his claimed arrearages under those orders—and the adjustment of the parties' financial affairs effected by the court's final decree. In her argument, defendant goes far beyond the evidence *introduced at the trial proper,* and points to evidence introduced back behind the decree, at earlier hearings. In the absence of any contention, or citation of authority, to the effect that all such matters were not merged in the decree (which does not mention any of them), we will disregard that part of the argument, and confine our attention to "THE EVIDENCE ADDUCED AT TRIAL", on which defendant's above quoted proposition is premised. On the subject of such merger, notice Nowell v. Nowell, 157 Conn. 470, 254 A.2d 889, 896, and cases there cited, Holmes v. Holmes, 66 Wyo. 317, 211 P.2d 946, 956, 957; McCaleb v. McCaleb, 177 Cal. 147, 169 P. 1023, 1024, and 24 Am.Jur. 2d, "Divorce and Separation", § 560.

In support of her contention that the $240.00 per month, the decree awards her for the support of her three minor children, is "grossly inadequate", defendant points out that the decree provides for no "educational support" for the adopted daughter, Linda, who was over the age of eighteen, and attending business college, at the time of the trial. Defendant points to no evidence showing that the three minor children's expenses total more than $240.00 per month; but her position seems to be that, because the record contains evidence indicating that plaintiff's gross income from his insurance business and rental properties totaled more than $24,000.00 for the year 1967 (before this action was commenced), plaintiff can afford to pay more than $240.00 per month for the children's support. She suggests an arbitrary deduction (unsupported by evidence) of 50% of this gross income, as plaintiff's "overhead", and another arbitrary deduction of $5,000.00, which she labels "back depreciation"; and, using these arbitrary figures, she computes plaintiff's "usable monthly income" to be $1,436.60. Then she states (in her initial brief): "No award of less than ¼ of a man's usable income is clearly against the weight of the evidence."

Plaintiff's counsel does not directly brand the above described argument as "sophistry", but they do point to evidence indicating that plaintiff's net income was not nearly as large, even in 1967, as the gross income figures defendant's argument focuses upon, that, because of various obstacles and reverses that have beset him, in conducting his business since this, and other litigation, began, his usable income, since 1967, has not been as much as it was then, that it is doubtful if it will regain that level at any time in the near future, and that actually he is in a financially precarious situation. Plaintiff's counsel further point out, as to the court's failure to include the adopted daughter, Linda, in the decree's child support provisions, that providing for the support of a daughter of her age and school status is permissible, but not manda-

tory, under the provisions of 12 O.S. 1968 and 1969 Supp., § 1277. Without further lengthening this opinion by detailing the evidence relative to the amount plaintiff should pay for child support, we think it is sufficient to say that we have carefully examined, and weighed, all of it, and have been unable to conclude that the decree's award of child support is clearly against the weight of the evidence or constitutes an abuse of the trial court's discretion. We recognized in Smith v. Smith, Okl., 396 P.2d 1016, that the fact that a father's income may be as large, or even larger, after his divorce, than before, may be no indication of his ability to maintain his children, then, in the manner to which they had become accustomed, during the marriage, while all members of the family were living in *one* household. If plaintiff's business survives, and, on the basis of his income, and the children's needs, in the future, an increase in the amount of child support payments is justified, then the present decree can be appropriately modified.

■ Under her "PROPOSITION II", defendant also complains that the decree contains no award of alimony for her. Plaintiff states that the record does not show he "was at fault (in the matter of the parties' incompatibility) to the extent to justify awarding alimony * * *" to defendant. This Court demonstrated in Dowdell v. Dowdell, Okl., 463 P.2d 948, that a wife may be awarded alimony where the husband's fault is partly responsible for the couple's incompatibility; and, since this plaintiff's statement does not refute the premise that a husband may be required to pay his wife alimony where some fault, on his part, accounts for the couple's incompatibility, it is not incumbent upon us to weigh the evidence to determine the relative fault of the parties, or to ascertain the *extent or degree that either contributed to* their incompatibility.

Defendant does not contend that she will not be able to support herself with the property awarded her, and the skill she has acquired in the grooming of poodle dogs, were it not for the inadequacy of the in-come from the dog kennel to defray the monthly installments on its mortgage indebtedness. Plaintiff suggests that if the kennel's income really is as low as defendant claims, she should sell it. This could constitute sound advice, as the record indicates that the kennel property may have substantial value for residential purposes, aside from its value as business, or commercial, property. Under all of the facts and circumstances which the evidence in this case tends to show, it is our opinion that the trial court did not err, or abuse his discretion, in not awarding defendant alimony, in addition to that portion of the parties' jointly acquired property, that she was awarded.

■ Nor can we say that the property division, prescribed in the decree, was in error, as the defendant contends under her "PROPOSITION III". The computation, set forth in her brief, represents the parties' jointly acquired property as being worth a total of $83,264.76, and the total value of the share awarded her as only $32,684.00. She contends that the trial court should have awarded her property, and/or its money equivalent, of a value of ½ of $83,264.76, or $41,632.38; and concludes that the trial court's award to her was $8,949.38 less than it should have been. The largest discrepancy, between plaintiff's and defendant's respective computations of the values of the property shares awarded each, seems to hinge upon the question of how much the couple's insurance agency appreciated in value during the parties' marriage. On the basis of the information the court's appointee, Mr. G, obtained concerning that business, prior to January 1, 1968, he fixed the agency's value at $20,-373.25. It appears to be defendant's position that, since there was an appraisal of said agency's value introduced in plaintiff's previous divorce action—only a short time before she and plaintiff were married—representing that the insurance agency's value was then only $5,000.00, she is entitled to money, or property, of a value of ½ of this more than fifteen-thousand-dollar-increase. Defense counsel recognizes that,

during this case's preliminary stages, and long before it came to trial, plaintiff testified that the agency's value was between $15,000.00 and $20,000.00; but this estimate, as well as Mr. G's appraisal of the agency's value, was made on the basis of its operation before plaintiff's difficulties culminated in the cancellation by Safeco Insurance Companies—whose policy premiums had accounted for the bulk of the Gamble Agency's income—of said Agency's contract and authorization to any longer sell its insurance. From the evidence, the value of the Gamble Agency, at the time of the trial, may have been nearer $5,000.00 than the $20,373.25 estimated by Mr. G. In view of this, and of the expenses of the defendant that the decree requires plaintiff to pay, and of the fact that, under our previous decisions, the "equitable" division of jointly acquired property, prescribed by our Statutes, is not necessarily an "equal" division, it is our opinion, after a careful examination of the evidence, that the trial court cannot be held to have erred or abused his discretion in the property division he decreed. His judgment as to that feature of the case is therefore also affirmed.

■ Under her "PROPOSITION IV", defendant complains that the total of $2,-000.00 ($500.00 "temporary" fee previously paid, and $1,500.00 "final") the trial court ordered plaintiff to pay, as her attorneys' fees, is "substandard". A part of plaintiff's position, as advanced in his brief, is that the matter of attorneys' fees is not an issue in this appeal.

Defendant's motion for a new trial contains no specific complaint about attorneys' fees; but in defendant's reply brief, she contends that this issue was sufficiently raised by the 6th ground for a new trial, set forth in her said motion, as follows: "Errors of law occurring before and during trial and excepted to by the defendant." The transcript of the proceedings reflects no exception taken, by defendant, at the trial, to the amount of the attorneys' fees allowed her. On the other hand, the record of the hearing on her motion for a new trial reveals an oral statement made by her counsel to the court (quoted in plaintiff's brief), in which he proclaimed that he had no interest in the attorneys' fees, stated that he was not likely to raise any issue about them, expressed the belief that "they are most equitable" and concluded by saying: "We haven't raised the issue on Motion for New Trial." Thus, any present claim by her counsel that defendant's motion for a new trial was intended to lay a predicate for contesting, on appeal, the attorneys' fee allowance, is belied by the statements he made in open court on the same day he filed the motion. In view of this, and the reply brief's further statement that the matter of such fees "is not an issue of primary importance", we will not consider it, but uphold, without further comment, the trial court's allowance for defendant's attorneys' fees.

We note, from a review of the record, that has been made in this appeal, that on October 6, 1969, this Court entered an order as to plaintiff's visitation of David, and his payment of child support pendente lite. We also note that in February of this year, defendant voluntarily filed in this appeal a writing, bearing certain figures, represented to be her total costs in perfecting this appeal, with the request that the total thereof, $1,361.97, "be allowed and taxed as required by law in this case."

As we have found no merit in any of the arguments advanced by defendant, the judgment and decree of the trial court is hereby affirmed, and it is ordered that the previous order of this Court now in effect for plaintiff's payment of child support be, and it is hereby, superseded, and its effectiveness terminated by this opinion. It is further ordered that the court costs incurred in this appeal be, and are hereby, taxed against defendant, and it will be her obligation to pay any additional costs that she has incurred by reason thereof.

IRWIN, C. J., BERRY, V. C. J., and DAVISON, JACKSON and LAVENDER, JJ., concur.

HODGES and McINERNEY, JJ., concur in result.